

EXHIBIT

_____ B _____



## Planet **Depos**®

We Make It *Happen*™

# **Transcript of David Chu**

**Date:** January 9, 2026
**Case:** Chu -v- Magic Leap, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of David Chu
Conducted on January 9, 2026

1 (1 to 4)

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - x

DAVID CHU,                :

        Plaintiff,    :

   v.                   :  Case No.

MAGIC LEAP, INC.,      :   1:25-CV-00574-RCL

        Defendant.     :

- - - - - - - - - - - x

VIDEOTAPED DEPOSITION OF DAVID CHU

HELD REMOTELY

Friday, January 9, 2026

10:00 a.m.

Job No.: 614088

Pages: 1 - 172

Reported By:  Debi Pearce

---

**Page 2**

Videotaped deposition of DAVID CHU, held remotely, pursuant to notice, before Debi Pearce, Notary Public in and for the Commonwealth of Virginia and the States of Maryland and Tennessee.

---

**Page 3**

A P P E A R A N C E S

APPEARING VIA VIDEOCONFERENCE ON BEHALF OF PLAINTIFF DAVID CHU:

        JEREMY C. HUANG, ESQUIRE

        ROWE WEINSTEIN & SOHN, PLLC

        Suite 640

        909 Rose Avenue

        N. Bethesda, Maryland 20852

        301.770.4710

APPEARING VIA VIDEOCONFERENCE ON BEHALF OF DEFENDANT MAGIC LEAP, INC.:

        CHRISTINA M. HEISCHMIDT, ESQUIRE

        GIOVANNA BONAFEDE, ESQUIRE

        WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP

        Suite 510

        8444 Westpark Drive

        McLean, Virginia 22102

        703.245.9300

---

**Page 4**

A P P E A R A N C E S   C O N T I N U E D

ALSO PRESENT:

        KYLAN BARRY, PLANET DEPOS TECHNICIAN

        BRENDAN CASE, PLANET DEPOS VIDEOGRAPHER

---

**I think the official title for a lot of people was software engineer.**

Q  But in there your entire time at Google, did you oversee individuals?

**A  Maybe for my first six months I did not.**

Q  Okay.  And after that, you had people that you supervised?

**A  Right.**

Q  And was the process the same for review and potential for increase of salary and potential for increase in bonus?

**A  I think so.  When I was more junior, there may have been less things I could do.  I don't remember.**

Q  Now, at Nvidia, you mentioned that you also supervise individuals.  Do you have sole authority to increase salary and administer bonuses in your current position?

**A  No, I do not.**

Q  So what's the general hierarchy of being able to alter a salary?

**A  Usually, it's there's an annual review and it gets approved by myself and then goes up to my supervisor, and then as far as I know he doesn't need further approvals, he just approves it.**

Q  And then what about bonus structure; do you set forth the bonus structure, or is that something that has to be approved by a higher up?

**A  It's kind of a recommendation model.  But there's no equivalent, as far as I know, of the more generous Google version of doing things where I could award somebody, you know, the hypothetical million dollars.**

Q  Right.  Okay.  No unilateral pot of cash for distribution, other than Google?

**A  Every company is different.  Every company is a little bit different there.**

THE WITNESS:  Can I take a break for a second to stand up a little bit?

MR. HEISCHMIDT:  Yeah.  Do you need a five- or 10-minute break?

THE WITNESS:  Five is fine.

MS. HEISCHMIDT:  Five?  Let's take a five-minute break.  Let's come back at -- just to

make it easy, let's just come back at 10:55, if that's okay.

THE WITNESS:  Sounds good.  Thanks.

MR. HEISCHMIDT:  We can go off.

THE VIDEOGRAPHER:  The time is 10:46 a.m.  We're going off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  The time is 10:55 a.m.  We're now back on the record.

BY MS. HEISCHMIDT:

Q  All right.  Thank you, Mr. Chu.  So getting back to the questions:  When did you first join Magic Leap?

**A  Was it August '21?  I think it was August '21.**

Q  And what brought you to Magic Leap?

**A  It seemed like an interesting opportunity, and, yeah, so that was the main reason.**

Q  Did you apply to a position announcement, or were you recruited?

**A  I was recruited.**

Q  Who recruited you?

**A  One of my former managers at Google, his name was Anuj.**

Q  Anuj.  Okay.  And Anuj was at Magic Leap at that time?

**A  Yes.**

Q  And were you still at Google when you were recruited to join Magic Leap?

**A  Yes.**

Q  And what was your role when you were hired?

**A  It was similar to my vice president of -- something.  I don't remember what the something was.  Vice president of something.**

Q  When you say it was similar to and then trailed off, what was that thought; it was similar to?

**A  I gained more responsibility while I was at Magic Leap.**

Q  Okay.  So your title when you first joined Magic Leap and when you left were different and the responsibilities were different?

**A  Yes.**

Transcript of David Chu

16 (61 to 64)

Conducted on January 9, 2026

61

person met that metric?

A Again, I don't know how the company thought about it. I was only there, I believe, for one round of this bonus thing, so I didn't see it enough times to know.

Q So you weren't involved in any of the negotiations with your -- with those that you supervised regarding their bonuses?

A No. That was -- I believe that was part of the thing where I would recommend to my supervisor what their compensation would be.

Q While at Magic Leap, okay.

When you were bringing them on, other than the annualized bonus, was there any signing bonuses that were considered for those individuals that you supervised?

A I believe so. I believe so.

Q And was that something that you could decide, or is that something also that HR would determine for the amount?

A I think both of us were probably involved.

Q So there was a discussion?

62

A I think so. I don't remember the details, but I think so.

Q Was there room for negotiation for those bonuses?

A Yeah. Yeah.

Q And were they ever altered?

A Maybe. Probably. Negotiations probably at least altering, that's probably a fair conclusion; but, again, I don't remember the details.

Q And when the salary and any sort of bonuses were -- sign-on bonuses or anything prior to their actual employment determined, how was that memorialized to the employee?

A I never saw it memorialized for the employee, so I don't know.

Q Okay.

A I only have my own case to refer to.

Q So it was not your role to send out any sort of offer letter?

A No.

Q Who sent out the offer letters to those

63

that you supervised?

A I don't know. I assume that was people, but I don't know.

Q Sorry, did you say you assume it's who?

A The people, people operations side of the house, but I don't know the exact detail.

Q Is that human resources?

A How did we -- I don't -- sometimes human resources was a different department. I don't remember the names at Magic Leap for who did what.

Q The people department, is that the one that was involved with compensation structure?

A Yes. Yes, that's right.

Q Okay.

A Human -- I may be referring to that one where people get involved like, hey, someone curses at work. You know, that kind of stuff.

Q With human resources?

A I think so.

Q Okay.

A I don't remember how Magic Leap divvied up the responsibilities there.

64

Q But there was an entire department that, essentially, made the determination as to, yes, this would -- we approve this bonus, we don't approve this bonus?

A For the run-of-the-mill cases, yes.

Q So when they're coming on board, this department has to make that determination, and then it gets memorialized in the group that you supervised offer letters, or whatever written document it is?

A I think so. I think so.

Q Did any of your employees have employment contracts?

A What is an "employment contract" in this case?

Q So something other than an offer letter, where there's terms for their employment for the year, it's whatever it may be?

A You know, I don't know because a lot of things were done sort of -- like sometimes the managers didn't know about stuff.

Q So we discussed the annual bonus, and we

Transcript of David Chu
Conducted on January 9, 2026

73

Q What did we not cover?

A What did I say before?

Q I'm not going to opine as to what the record is. So I mean, is there anything that you believe you didn't cover?

A No, I think I covered most of the stuff; but I may have forgotten something. Again, it's been a couple of years.

Q Did you ever directly deal with any contract between Magic Leap and your direct reports?

A What do you mean "deal with"? I don't quite --

Q Did you ever participate in the negotiation of any sort of contracts or -- yeah, or a written negotiation of compensation with Magic Leap and your direct reports?

A It's likely. I don't remember any specific cases, but it's likely.

Q Can you recall any situation in which there was a compensation drop off with one of your direct reports that needed to be addressed?

74

A Yeah. Similar to what we're talking about here. Yeah, there probably was one or two or three. I just don't remember the names or anything like that.

Q Without needing to know the names, how was that addressed?

A Again, I don't remember how the sausage was made on those, but I think, if I were to guess, it would be similar to what we saw in this case, which was -- it was, you know, report expressed that they were -- somebody that worked for me expressed that the compensation wasn't up to where they needed it to be, and there was some back and forth, and then either me or HR person would communicate, Hey, here's your new numbers, what do you think? It would be written form, and if that was agreed upon, then we would move forward and talk to Kevin.

Q Okay. But you don't -- you're not sure if that's how it went?

A There are probably some e-mails that look like that, I would guess, but I'm not 100 percent

75

confident.

Q So you're not certain. And you don't recall a specific situation in which that happened?

A I don't recall. But I would guess that that would be -- it would not be surprising to find such a case.

Q But you don't recall a specific one?

A I don't recall a specific one, but it was pretty typical, I would say, as a manager to have such cases.

Q Right. Okay. So you don't recall, but when you were talking about the process, did you have unilateral authority to raise the compensation?

A I don't remember. I don't believe so. I would have had unilateral authority, but me, being me, I would have always checked with somebody to see if I could say to the person, yes, you know your new comp is this, like agreed, right.

Q When did you leave Magic Leap?

A Spring -- certainly after the time. I

76

think the e-mails were April, something like that, so probably May.

Q Of which year?

A '23? Do I have that right?

Q I'll let you answer to the best of your ability. Are you not sure?

A I think it was '23. Am I allowed to look at online websites and stuff, or not?

Q We'll just say that you don't recall the year. You know, we have documents we can go over. I know it is the new year, so it throws everything off.

A I feel like it's '23. I feel like it's '23, but, yeah.

Q And, again, what was your full title when you left?

A Vice president of perception and -- this is a real memory tester.

Q It is and it isn't.

A Immersion. Perception and immersion, I think.

Q Okay. And in that position when you left

Transcript of David Chu
Conducted on January 9, 2026

21 (81 to 84)

MS. HEISCHMIDT: All right. If we could take a 10-minute break so I can get more water and not start coughing, that would be great.

THE WITNESS: No worries.

MS. HEISCHMIDT: If we can come back on 11:35.

THE WITNESS: Sure. I had a question. Do we have a schedule for lunch break, or are we working straight through?

MR. HEISCHMIDT: I guess we can go off the record and discuss that.

THE VIDEOGRAPHER: Please stand by. The time is 11:44 a.m. We are going off the record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 12:16 p.m. We're now back on the record.

BY MS. HEISCHMIDT:

Q Mr. Chu, getting back to the questions: What was your starting salary as VP at Magic Leap?

A Can I refer to my papers? No, that's fine. I really don't remember the numbers, I've got to be honest with you. If you show them to me on the screen, I'll probably agreed to them; but I don't remember.

Q Okay. We can do that.

MS. HEISCHMIDT: Kylan, can we pull up the Exhibit Complaint.

(Whereupon, the above-referenced document was marked as Exhibit 1.)

Q Mr. Chu, I'm going to show you -- the overall document is the complaint that you filed in this case, but what I want to refer you to is the exhibit that you included, which is -- let's see, do I have -- which is going to be --

MS. HEISCHMIDT: Kylan, page 12 of the document.

So Mr. Chu, do you recognize this document?

A Yes. Yes, this looks like the initial thing that I agreed to here.

Q And when you say "the initial thing," is this the offer letter that you received prior to accepting the employment?

A Yes, I think so.

Q And you received this letter on or around July 9th of 2021?

A Yeah. That sounds about right, I remember.

Q And scrolling down momentarily to page 15, did you sign this document?

A Yes, that looks like me.

Q Okay. So let's scroll back up to page 12 of the PDF.

MS. HEISCHMIDT: Thank you, Kylan.

Q Okay. So asking the -- asking my question again: Do you recall what was your starting salary as vice president at Magic Leap?

A It looks like $330,000.

Q And, to your knowledge, was that the salary that you -- that you actually agreed upon and received?

A You know, the funny thing is I never bothered to check whether the money that goes into my bank is what I agreed upon. I don't do that for any job.

Q Do you have any reason to believe that Magic Leap did not pay you the salary they said they would pay you?

A I believe they paid what is -- yeah, this $300,000, I think they paid that.

Q Over a, you know, run-of-the-mill pay period structure?

A That's correct.

Q And, to your understanding, the salary was irrespective of any sort of bonus?

A Yeah. There was some bonus stuff later. I'm looking at it here, as well, on the screen with you guys.

Q Yeah. So the $330,000 was just salary, correct?

A Uh-huh.

Q And that was memorialized here in the offer letter. Okay.

Did you receive any sort of bonus in the 2021/2022 employment year?

A I think so. I think I did. There was something in here, I think, about a 35 percent as well, as I recall. I don't think it quite reached

Q But that was expected, right?

A It was expected, and, therefore, I felt a duty to my family to renegotiate that.

Q And when you say "renegotiate," what do you mean by that?

A I mean that similar to how, you know, you negotiate at a car dealership for a car, Hey, I'm working for you guys, I feel like my compensation is not what the market is suggesting it should be based on my experience at Google, right, which I had the most recent experience of, and also based on my first year experience where you guys compensated me more, so can you help remedy this compensation discrepancy.

Q And who was that conversation with?

A Julie.

Q Anybody else?

A Who was still there at the time? Maybe Jose was still there at the time. If we pull up the e-mail threads, I think Jose was on some of the e-mail threads. There may have been other people as well. But I think I talked mostly with Julie. I don't think I talked to anybody else, really.

Q Did you have any verbal conversations with Julie?

A Yes.

Q What were the substance of those conversations?

A She sympathized with the fact that my pay was dropping by quite a bit, and I'm -- expressed to me that she would work to fix it.

Q And did you have any discussions with her about bonus structures?

A No, I don't think so.

Q Okay. There was no --

A There was no annual bonus discussion involved. Like what we see here, the annual bonus, that was not involved. It was more the retention bonus. Because, as you can see, the annual bonus, even if you doubled it, it wouldn't make up for a retention bonus sort of thing. And the retention bonus was more guaranteed and I wanted something along that line.

Q So what were the discussions that you had regarding the retention -- what you're calling the retention bonus for your second year?

A I wanted to at least see if I could stay level with the year before, and I think, ultimately, that was not possible, but the company still seemed to have put in some effort and so, eventually, there was the amount that I think is in dispute here.

Q And when did you first bring up the issue of needing additional compensation for your seconding year?

A Probably around my one year anniversary.

Q Okay. Was it before, or after, you kind of pushed into the second year?

A I don't remember, but it's probably one month before, one month after. I don't remember the exact time.

Q Did you sign any documents which outlined this potential bonus plan or what you're calling the retention plan for your second year?

A We had the e-mail documentation.

Q Did you sign any documents?

A E-mail is as good as signing, isn't it?

Q No. Did you sign any documents, though?

A That's what I'm saying when I said e-mail is as good as signing.

Q I'm asking -- that's not the question I asked you. I asked you did you sign any --

A You mean wet signature?

Q Wet signature or DocuSign.

A I don't think so.

Q Okay.

A My understanding is wet signature and DocuSign is not necessary to have an agreement.

Q Well, that's not what I asked, though. I -- I'm asking you if there was an actual written agreement that was signed by you with a structure, and I'm not asking about e-mails.

A Okay. Well, if you're taking e-mails off the board, then I would say no; but there was the e-mails.

Q Why weren't there documents that had your signature?

Q Do you recall who you corresponded with?

A Was it Julie, maybe, or the new Jose. I don't remember who it was.

Q Before you noted that you did not receive $100,000, was there any correspondence in Q1 about you meeting the metrics or any sort of expectation of payment?

A I don't think so.

Q Okay. You never spoke to Julie, or anyone else, saying, Hey, I'm 80 percent here to meeting the metrics?

A "80 percent"? Sorry, what was that?

Q Just as an example. You know, I am this -- I am this close to meeting Q1's goal, did you ever have a conversations with Julie or anyone else?

A I think by the end of Q1, when I was ready to receive my bonus, we had already passed -- sorry, we had already passed the milestone. We had already passed the milestone.

Q During Q1, was there any conversation of your progress towards that milestone with Julie or anyone -- Julie, Jose, Vicki?

A We might have had a -- I don't remember what form of the communication was had, was it a meeting, was it an e-mail with results, but there was some something where we all understood that the milestone was already met.

Q When did you meet that milestone?

A I don't remember the exact date. It was sometime --

Q So you had -- sorry, go ahead.

A Yeah, so it was sometime before the end of the quarter. There was never any disagreement about whether I had met it. Everybody had agreed that I had met it. Everybody had, to some degree, agreed that I met it, yeah.

Q But was there -- were there any updates within Q1 before you had met it that you were updating Julie, or anyone else at Magic Leap, that you were getting close to your goal and your metric for that bonus plan?

A I don't recall.

Q In Q1, did you have any other further conversations with Julie, or anyone else at Magic Leap, about the expectation of the $100,000 due to either getting close to your metrics or meeting your metric?

A I probably had a conversation with Julie at some time before or after the e-mail.

Q When did you have that conversation?

A Again, I don't remember the order, but in that conversation, I likely expressed that I was surprised that I had not received my compensation, the $100,000.

Q You "likely" had this conversation, or you did?

A Likely. I don't remember when we had the conversation.

Q So you don't know if it was beforehand?

A I don't know if it was beforehand.

Q And you don't know if you did express your surprise?

A When we had the conversation, I did express surprise and disappointment.

Q Before you were even set to receive it?

A No. After I was set to receive it.

Q So this would have had to have happened after Q1, correct, when you did not receive $100,000?

A Right. I think I only brought the topic up sometime in April, right, which would have been after Q1.

Q So you had no communications before April about meeting your metrics outlined in your agreement or your expectation of receiving 100k?

A So there's two parts to that question. Meeting the metrics, there may have been some communication for the compensation part. I don't think I brought anything up until after Q1 was over.

Q So for meeting the metrics, who did you discuss the meeting metrics with your progress of meeting metrics?

A Again, I don't remember if it took the form of review or e-mail or what have you about that.

Q So you don't remember any specifics about

149

a conversation?

A I remember that there was no -- there was universal agreement that that metric was already hit.

Q How do you remember that there was universal agreement?

A Because people were commenting the fact that the hand tracking was better.

Q Who were the "people"?

A Julie, I believe, was one, our product people, user study people.

Q Was that defined as the people that get to determine whether or not the metric has been met?

A I believe that was mostly -- that determination was just -- again, there was multiple factors that came into that. It could have been objectively met, it could have been via user study met, it could have been by Julie being the final arbiter.

Q How do you know that that's how the metrics are met?

A Because there was wide -- Julie didn't

150

disagree that the metrics were met.

Q Do you have anywhere in writing that Julie is the decision-maker as to whether or not the metrics are met in the sense that it's written as to what the metrics are? Does she get sole decision? Does she get --

A Usually, if somebody has laid out milestones, then they are evaluated by their manager, and so that was the expectation in this case.

Q But didn't you say that the metrics were met universally by many individuals and many factors?

A She would have taken many perspectives into account that they were met.

Q But there's nothing outlined as to who that is or what this is?

A I think she was the final arbiter.

Q You "think," or does it state somewhere?

A I think.

Q Because that's not in the e-mail, is it?

A It might be in some other documents.

151

Q That are not a sole agreement together with a written signature.

A Again, I think that there were multiple ways for me to show that I had improved hand tracking.

Q But the multiple ways weren't memorialized in any sort of document?

A I just had to improve it. I just had to improve it.

Q But who gets to make that determination?

A Well, I guess the judge at the end of the day.

Q You're saying that when you entered into this alleged agreement, at the end of the day, you were expecting that only a judge could make a determination as to whether or not the metrics included multiple sources or just Julie?

A My guess is our default thinking was that Julie would have a clear view because against the general version of this for milestones is that your manager has ability to figure out whether you met it, but in this case, if we don't think that

152

Julie -- if I were to appeal, then, ultimately, it would be whether my side of the bargain was held up, right?

Q But that's not memorialized in the e-mail, is it? It's four words.

A That's right. So I just had to show to somebody at the end of the day, I would start with Julie, and, if that didn't work, then we would -- I would need to think carefully about who I should have shown it to. But I don't think this was ever in any dispute because my -- Julie had expressed that we met the milestone already.

Q But there wasn't anything that just went over all the elements that you just described fully written down to be clear that those were the metrics, correct? It was expectation?

A We put it in such a way that I would have had a good degree of confidence that I would hit the metric, but I would have to work to hit the metric, which I did, and also Julie indicated that I did hit the metric.

Q So there was an element of ambiguity with