

EXHIBIT
C



Planet
Depos

# Transcript of Victoria Stewart

**Date:** January 23, 2026
**Case:** Chu -v- Magic Leap, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

Transcript of Victoria Stewart
Conducted on January 23, 2026

1 (1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------- )
DAVID CHU,                    )
                              )
            Plaintiff,        )
                              )
        v.                    )  Case No.:
                              )  1:25-CV-00574-RCL
MAGIC LEAP, INC.,             )
                              )
            Defendant.        )
-----------------------------)

Videotaped Deposition of VICTORIA STEWART

Conducted Virtually

Friday, January 23, 2026

10:31 a.m.

Job No:  613574

Pages:  1-155

Reported by:  Tracy Obering, RPR/CCSR

**Page 2**

Videotaped deposition of VICTORIA STEWART, conducted virtually.

Pursuant to Subpoena and Notice of Deposition of VICTORIA STEWART, before Tracy Obering, Registered Professional Reporter and Notary Public in and for the State of Maryland, who administered the oath to the witness.

**Page 3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

(Present Via Videoconference)

    JEREMY C. HUANG, ESQUIRE

    ROWE WEINSTEIN & SOHN, PLLC

    909 Rose Avenue

    Suite 640

    North Bethesda, Maryland  20852

    (301) 761-3837

ON BEHALF OF THE DEFENDANT:

    CHRISTINA M. HEISCHMIDT, ESQUIRE

    GIOVANNA BONAFEDE, ESQUIRE

    WILSON, ELSER, MOSKOWITZ,

    EDELMAN & DICKER, LLP

    8444 Westpark Drive

    Suite 510

    McLean, Virginia  22102

    (703) 245-9300

ALSO PRESENT:  SEDRICK LAMPKINS, VIDEO TECH

              BRAD SYDORICK, VIDEOGRAPHER

**Page 4**

C O N T E N T S

EXAMINATION OF VICTORIA STEWART            PAGE

    By Ms. Bonafede                          6


E X H I B I T S

    (Attached to Transcript)

EXHIBIT NUMBER                             PAGE

1    Email from Ms. Zajia, 4/25/2023        22

2    Email from Mr. Baltazar, 10/19/2022    30

3    Proposed Distribution - L3 Leads Detailed  35

4    Email from Ms. Stewart, 12/16/2022     48

5    Email from Ms. Stewart, 1/21/2023      60

6    Email from Ms. Green, 3/22/2023        68

7    (Not marked)

8    Email from Ms. Stewart, 4/11/2023      78

9    Email from Mr. Chu, 4/17/2023          87

10   Email from Ms. Stewart, 12/16/2022     93

11   Email from Ms. Bernal, 4/25/2023       102

12   Email from Ms. Green, 4/25/2023        107

13   Email from Mr. Chu, 4/17/2023          115

14   Email from Ms. Green, 4/17/2023        133

Transcript of Victoria Stewart
Conducted on January 23, 2026

of this plan in October of 2022?

A. Oh, you are talking about Peggy. I am sorry. I didn't understand the question.

So we had -- if you see, we had Peggy's approval to conceptually moving forward with the retention plan for David Chu, yes.

Q. All right. So as part of this email chain on the last page you included a document called, "Compensation Retention," I guess sort of the spreadsheet showing the retention plan for Mr. Chu; is that correct?

A. You are talking about that chart that you're showing here? Yes, correct. That was the framework that we were considering for Mr. Chu.

Q. Okay. And the specific dollar amounts per quarter; is that correct?

A. Specific dollar amounts per quarter based on defined milestones for him to achieve.

Q. Those would be defined by the CTO; correct?

A. They would be defined by the CTO, but they would have to be very specific, you know, with dates, et cetera.

Q. But it would have to basically just have to be -- so let's say here, it says March 2023 100,000, so without anything else, would it be fair to say that Mr. Chu had until the end of March 2023 to accomplish whatever milestones were defined by the CTO?

A. Not specifically. That could be -- there could be a specific date that it needed to be done by.

Q. Okay. But that was the determination of the CTO; correct? Ms. Green?

A. It would have been determined by Julie but, you know, to be detailed out in the document.

Q. All right. Is there anywhere in this email chain before you that mentions that this is a proposal?

A. We're talking about the design of the plan and we are looking for feedback, so --

Q. But does it mention anywhere that this -- I am sorry. If you are not finished answering, please continue.

A. Well, based on this email stream, this was something that was being proposed. It was the framework of what a retention plan might look like. And we were seeking feedback in order to be able to go to the next steps with finalizing the plan.

Q. All right. Does it mention anything about going to the next steps or any next steps referring to that in this email chain?

A. "Please take a moment to review the attached and provide us with your feedback and/or any questions you might have."

So this wasn't -- at this point in this email stream, it was something that was being presented for consideration but it wasn't anything that was final.

Q. Does it say "draft" in this email anywhere?

A. No, it does not.

Q. Okay. All right. So you mention you were getting feedback. And you see Mr. Chu's response, I guess it's at 6:52 p.m.?

A. Yes, I do.

Q. So he says, "Let's do it"?

A. I see that.

Q. Okay. And you see Ms. Green's response below saying, "Happy to hear that. Looking forward to all we can accomplish"?

A. I see that.

Q. Okay. Is there any subsequent email mentioning, hey, we'll circle back with an additional document for you to sign?

MS. BONAFEDE: Objection. Calls for speculation.

BY MR. HUANG:

Q. Please answer the question.

A. I don't see that in this email stream.

Q. Okay.

A. But I do know that we were specifically looking for milestones to be detailed out before anything could be taken to the next step.

Q. Understood. All right.

A. Just because David is okay with the framework and Julie is like, I'm glad to hear

53

that, that doesn't mean it's done until we finalize all the details of the retention plan and get final approvals to document the Docusign.

Q. Was David aware there needed to be additional approvals?

MS. BONAFEDE: Objection. Calls for speculation.

BY MR. HUANG:

Q. Please go ahead and answer the question.

A. I don't recall at this specific time. I think -- I do -- if you want me to speculate?

Q. Actually, did anyone -- did you or anyone else in HR tell David explicitly that there were additional steps after this email chain?

A. I do believe there was other communications that came subsequent following this that indicated it would require additional approvals.

Q. And those were provided to Mr. Chu?

A. I don't know if they were provided directly to Mr. Chu or if they were provided to Julie and Shirley to articulate that.

54

Q. So what you recall was that Julie was informed, made aware there were additional approvals?

A. I believe so. I believe there were subsequent communications, whether it be via email or whether it be via meetings, but we clearly indicated that it was going to need to go to the board. And then if -- to the comp committee for final approvals.

Q. Okay. So what did you do after receiving this email chain in terms of furthering Mr. Chu's retention plan?

A. I do not recall specifically. But if I had to guess, I would have been trying to chase the detailed milestones.

Q. Okay. Would you have started generating the document that you referred to in terms of the Docusign?

A. Not until we got final approval.

Q. Okay.

A. So no.

Q. So for -- you recall from Mr. Monos'

55

email thread we just looked at -- would you like me to pull it up again to refresh your memory?

A. No.

Q. Okay. So in that email chain it took between two hours after you asked Mr. Baltazar for additional -- whether additional approvals were needed, you already knew at that point to generate a -- to start working, maybe not yet, to start working on getting the signed document out. Isn't that true?

A. Based on that snippet of emails that you shared with me, that's -- that would be a true statement. However, I don't recall how long I had been working on the one for Monos. I don't recall had I already gone through, you know, what amount of work or time leading up to that. And so they are two separate situations. So I can't -- I don't -- I don't see those two being connected.

Q. At this point what was your understanding of what needed to be done in order for a formal document to be generated for Mr. Chu?

A. At this point we still needed to

56

finalize the key milestones and then proceed with ensuring we had all the appropriate approvals.

Q. Was your understanding at the time that Mr. Chu was aware of what the milestones were?

A. I think there were some high-level ideas of some of the things he needed to accomplish, but I don't believe -- the milestones had not been detailed out.

Q. So other than this formal document you are referring to for Mr. Monos, was there any substantive differences between how Magic Leap handled Mr. Monos' retention and Mr. Chu's retention?

A. Again, they are two separate situations at different time periods within the company. So I don't see them as being connected.

Q. Okay. So in that email chain, all from November 29th and November 30th, Mr. Monos' plan and Mr. Chu's plans were discussed; isn't that correct?

A. You had a separate email stream that discussed, yes, John Monos' retention plan. But

Q. Okay. All right. On this end you mentioned, the last sentence it says, "I just want this to be brought back to the surface as I don't believe this has been initiated pending the defined milestones."

Whose responsibility was it to get this plan initiated?

A. I'm not sure I understand your question.

Q. So you wrote that this plan had not been initiated; correct?

A. Correct.

Q. What needed to be done in order to get this initiated?

A. She needed to define the milestones that we could attach to the retention plan.

Q. "She" being Julie Green?

A. Julie.

Q. Okay.

A. And then, you know, pending the approvals. Because again, as this states, we didn't have approval on the funding. We were confirming the approval for the funding of it. I think I mentioned in prior statements, finance is also involved in retention plans to confirm that the funding is available -- can be accrued for the business to be paid out in accordance to the retention plan as designed.

Q. What you are saying is basically it's Julie's fault that this hadn't gone yet?

MS. BONAFEDE: Objection. Mischaracterizes the witness' testimony.

BY MR. HUANG:

Q. So your testimony was that this plan had not been initiated, but for Ms. Green's definition of the milestones. Would that be accurate?

A. No. I think you are misstating what I spoke. For us to take it to the next level, we had to have the defined milestones associated with paying out the bonuses. So that had to be there. But we also needed to ensure we had funding approved.

And, you know, I do know that at the same time we were going to the board for the approvals of the retention plans which would have included -- potentially included David's at that same time. So --

Q. Okay. So this email is about a little over a month after everyone's last discussion on December 16th; is that correct?

A. Based on the dates, I would agree.

Q. Okay. So your statement is that this had not been initiated pending the defined milestones; correct?

A. I think you are twisting my words a little bit.

Q. Okay. Well, during this month nothing had been done to further Mr. Chu's plan. Would that be an accurate summary?

A. It is accurate that we still did not have the detailed milestones that we'd asked for.

Q. Whose responsibility was it to provide those milestones?

A. The responsibility was Julie to put the specific milestones down for us.

Q. Okay. And after her email to you saying that I have the milestones, we agree on the milestones, did you respond to her further?

A. I don't recall.

Q. Okay. Does she say anywhere here that, I've given you a framework of milestones?

A. The only thing she states in the email stream is that we agreed on the milestones but haven't had a way to track -- haven't figured a way to track them yet, so --

Q. If they were as vague as you're claiming they are, how would she be able to track them?

A. You are asking me to speculate on something for Julie, which I cannot do.

Q. Okay.

A. It's her job as the chief technology officer to know what needs to be delivered and by when and that's the piece that was missing.

MR. HUANG: I'd like to pull up Exhibit 6, please.

(Deposition Exhibit Number 6 was marked for identification)

BY MR. HUANG:

73

Q. I'm not -- I'll let you finish.

A. Let me finish.

It would be funded through the approved retention plan that we were working on, which indicates it wasn't approved yet. It was once we had approval of that broader retention plan, it would be executed. But we still needed her milestones to include in the final design of his retention plan specifically.

So here is where we were trying to confirm where the funding was going to come from. And then as you can see in the March email, it was confirmed it had to be part of the retention plan that was going to the board.

Q. Okay. Again, I think we are -- kind of a gap in our communication. Let me focus again on what I'm talking about here.

We're not talking about David -- Mr. Chu's individual plan right now. We are talking about the funding through the broader approved retention plan. Okay? Which is what you say here. Now you're caveating and saying it's

74

still being worked on. Okay? But you wrote it was approved.

How can something be approved, but not approved? That sounds like a paradox. How would you explain that to me?

A. The intent behind that was saying that it would be funded through the approved retention plan. And I guess I should have stated, once it was approved, because it wasn't approved until it went to the board.

So I'm saying it would be funded potentially through the approved retention plan, meaning once it got approved, that's where it would be funded from.

Q. Okay. All right. So let's go back to Exhibit 6.

So you're admitting that the -- this retention plan you are referring to in your 9:00 email is the same retention plan you were discussing in the January email?

A. Correct. It's the same retention plan that was still pending sign-off.

75

Q. Okay. All right. And then you mention you have a meeting with the board of directors, slash, comp committee?

A. There was a meeting scheduled with the board of directors and the comp committee to try to get the retention plans approved.

Q. And you said, "Once approved, he will receive the full amount of what we discussed with him but the timing might be slightly off." Correct?

A. Correct.

Q. Does it mention anything about him needing to sign any additional documents?

A. It does talk about generating the employee agreement notifications.

Q. Okay.

A. So yes, that would have been required, but the timing might have been different based on the approvals. But we had to have approvals to generate the employee agreements.

Q. And that's approval by the board of directors, slash, comp committee?

76

A. At that time, yes.

Q. Okay. Not legal or anything else you referred to earlier?

A. I never said legal had to approve it. Legal executes the documents.

Q. Okay. So internal -- it doesn't have to go through internal employment counsel to get approved?

A. I never indicated it had to go through legal for any kind of approval. It goes through legal to execute the documents.

Q. Would it surprise you that Magic Leap's witness would say that it did?

MS. BONAFEDE: Objection. Vague.

BY MR. HUANG:

Q. Go ahead and answer, please.

A. I didn't hear what Giovanna said.

MS. BONAFEDE: It's okay. You can move on. I was just objecting for the record. You can answer though if you understand it.

THE WITNESS: I can't speak to that.

BY MR. HUANG: