EXHIBIT

D



# Transcript of Steven McCree Lake, Corporate Designee

**Date:** January 21, 2026
**Case:** Chu -v- Magic Leap, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

Transcript of Steven McCree Lake, Corporate Designee
Conducted on January 21, 2026

1 (1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

DAVID CHU,                )

          Plaintiff,   )

          Vs.          )  Case No. 1:25-cv-00574-RCL

MAGIC LEAP, INC.      )

          Defendant.   )

VIDEO RECORDED DEPOSITION

TESTIMONY OF STEVEN MCCREE LAKE

January 21, 2025, 9:35 a.m.

Job No. 617278

Pages: 1-230

Transcribed by: Cynthia Bauerle, CSR

Notary Public/Court Reporter: Jaime Breeden,

AAERT CER

**Page 2**

Deposition testimony of STEVEN MCCREE LAKE,

held via videoconference.

Pursuant to agreement, before Jaime Breeden,

AAERT, CER, Notary Public in and for the state

of Maryland.

**Page 3**

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

          JEREMY HUANG, ESQUIRE

          Rowe Weinstein & Sohn, PLLC

          909 Rose Avenue, Suite 640

          North Bethesda, MD 20852

          (301) 761-3837

          Jhuang@rowepllc.com

ON BEHALF OF THE DEFENDANT:

          CHRISTINA M. HEISCHMIDT, ESQUIRE

          GIOVANNA R. BONAFEDES, ESQUIRE

          Wilson Elser Moskowitz Edelman & Dicker LLP

          8444 Westpark Drive, Suite 510

          McLean, Virginia 22102

          (703) 245-9300

          Christina.Heischmidt@wilsonelser.com

(Continued)

**Page 4**

IN-HOUSE COUNSEL FOR MAGIC LEAP, INC.

          TIFFANY ANDERSON, ESQUIRE

          7500 West Sunrise Boulevard

          Plantation, FL 33322

          (954) 889-7010

          Legal@magicleap.com

PRESENT: Nya Estep-Remote Tech

          Aaron Anglin-Training Videographer

          Jack Dunn-Trainer

21

the head of HR, at the point, sent an arrangement to the CEO proposal, asked for approval, and the CEO responded, approved; is that correct?

A.    Yes.

Q.    Okay.  So what does the CEO's approval mean at that -- what did the CEO's approval mean at that point regarding this proposal?

**A.    Per our process, the approval would of allowed us to move forward with either working with employment counsel internally or outside counsel to create a more detailed and structured agreement that would have needed to be then further approved and signed.**

Q.    Okay.  All right.  And then at that point -- at what point would the proposal be, I guess, submitted to the employer, whoever it is that would need to look at the proposal?

**A.    Yeah.  So the process would be,**

22

**for any type of bonus plan like this one, once the CEO had approved like this, we would work with counsel, either, you know, our internal employment counsel or outside counsel, to take the business context that you see in this email.  Such as the specific milestones, technicalities about, you know, the timeline associated with them, how they're evaluated.  Those would be iterated on and discussed.  An agreement would be created, a formal document that would then be shared back with the employee for additional review and feedback.**

**And ultimately, once everyone was aligned, that would be memorialized through, typically, a Docusign where both the employee would sign either as an amendment to their employment agreement or some other, you know, enforceable agreement, and then a representative of the company would sign as well.  Typically the CFO or the CEO.**

MR. HUANG:  All right.  I appreciate the clarification.  Can we open up

23

Exhibit 2?

THE TECH:  Please, stand by.  Now displaying Exhibit 2.

(Exhibit 2, April 17, 2023 Email, marked for identification.)

BY MR. HUANG:

Q.    All right.  Sir, could you look through this document and just let me know when you're done?

**A.    Sorry.  Can you pause just a second so I can read?  Thank you.  Okay.  You can scroll down.  Thank you.  Okay.  You can scroll down.  Thank you.  Scroll.  Thank you.  Scroll.  Thank you.  Okay.**

Q.    All right.  And so are you familiar with this document?

**A.    I am.**

Q.    Okay.  So I just wanted to focus more specifically.  This April 17th, 2023, email from Mr. Chu to, I guess, Ms. Green, as well as Jose Baltazar and Victoria Stewart, was this the first time that Mr. Chu had

24

reached out to anybody at Magic Leap regarding the -- the payment that -- that was -- I guess, he thought that he understood was owed to him regarding the milestone, the retention payment?

**A.    As far as I'm aware, it was.**

Q.    Okay.  And, to your knowledge, had there been any discussion about payment of this retention amount prior to Mr. Chu's -- between December 16, 2022 and prior to Mr. Chu's April 17th email?

**A.    To my knowledge, there was no discussion.**

MR. HUANG:  Okay.  So there's one document I still need to -- I guess I need to -- should I still upload it to the -- the Planet Depo portal, or what would be the best way to share that separately?

THE TECH:  You can give it to me in the Zoom chat.  If you just wanted to drop it in the chat then I can --

MR. HUANG:  Sure.  I can do

---

29

arrangements?

A.    No.

Q.    Okay.  So what additional steps were needed to be taken?

A.    Similarly to what I shared before.  This type of discussion internally would then need to be -- there would be a few steps, actually.  Certainly, the alignment with counsel in order to craft some sort of binding agreement structure that both parties sign would be consistent with all of our other retention or milestone compensation, or -- or bonus plans.

In addition to that, for programs like this, because of the level of subjectivity in the milestones and things like that, there would need to be additional discussion with the stakeholders involved internally to align on things like additional specificity about what needs to be delivered, conditions around the milestones, any sort of dependencies, as well as how the achievement would be assessed.

---

30

So there would be -- there would definitely be more discussion internally, and then alignment with counsel, and ultimately a signed agreement with -- with both parties countersigning.

Q.    Okay.  But just looking at this email chain, is there any language indicating that this proposal was conditional or there's anything that required additional approvals of any sort?

A.    No.

Q.    Okay.  Does this email contain any language required saying that this retention was discretionary?

A.    Can you scroll down one more time?  No, it does not.

Q.    Okay.  And does this email mention, I guess, Amendment Seven or anything regarding no holder -- noteholder approval?

A.    It does not.

Q.    Okay.  Does it mention any -- any sort of approval, like, a subsequent

---

31

approval being needed?

A.    It doesn't.

Q.    Okay.  So going back to the email after the proposal from Ms. Stewart to Mr. Chu, what was Mr. Chu's response?

A.    Can you scroll down, please?  He shows appreciation and suggests that he would like to move forward.

Q.    Okay.  So would it be Miss -- I guess, Magic Leap and Victoria Stewart's understanding that let's do it would mean his acceptance of the proposal?

MS. HEISCHMIDT:  Object to form.

THE WITNESS:  Okay.  Can you rephrase that?  I'm not quite sure I understand.

BY MR. HUANG:

Q.    Okay.  So how did Vic- -- Ms. Stewart understand Mr. Chu's response?

A.    While I can't speak to her mindset, in general, what this appears to be, to me, is an affirmative response to move

---

32

forward with what Mr. Chu would likely have known were additional steps in order to formalize the agreement.

Q.    Okay.  Let me dig down on that.  What -- what gives Magic Leap -- what evidence do you have that Mr. Chu was aware of these additional requirements?  Is there anything written that -- that was, like, a written policy procedure regarding this additional -- these additional approvals?

A.    Mr. -- Mr. Chu was a very senior leader in the organization at the time.  He oversaw a significant part of our software team and was part of Julie's, the CTO leadership team.  Given the business conditions at Magic Leap and the transparency in the organization, he certainly should have known that there were more steps.  In addition to that, his original employment agreement featured the types of legal language and signatures that he should of expected to be in place for this type of agreement to be

---

Transcript of Steven McCree Lake, Corporate Designee
Conducted on January 21, 2026

formalized.

Q.    To Magic's knowledge, does Mr. Chu have any legal training whatsoever?

A.    **Not to my knowledge.**

Q.    Was he an attorney?

A.    **No.**

Q.    Did his resume reflect he went to law school at any time?

A.    **I haven't seen his resume.**

Q.    Okay.  All right.  So after Mr. Chu's response, did -- were there any additional -- you see a response from Ms. Larson-Green, correct?

A.    **I do.**

Q.    Okay.  And so she wrote, happy to hear that, looking forward to all we can accomplish together.  Do you see that?

A.    **I do.**

Q.    Okay.  Did Ms. Larson-Green understand there were any additional approvals required for this to move forward?

A.    **Yes.  She would have definitely understood that.**

Q.    Okay.  So after this email, did Magic -- Magic consider Mr. Chu's retention arrangement to be in place?

A.    **We did not.**

Q.    Okay.  I'd like to pull up -- let me make sure I have it right.  All right.  Plaintiff's Exhibit 3.

THE TECH:  Please, stand by.  Now, displaying Exhibit 3.

(Exhibit 3, January 21, 2023 Fwd: Retention Plan Email, marked for identification.)

BY MR. HUANG:

Q.    All right.  Sir, could you please review this email and then let me know when you're done?

A.    **Down.  Okay.**

Q.    All right.  So this is an email from Victoria Stewart to the CTO, as well as the head of human resources, Jose Baltazar, as well as, I guess, the pending successor,

Ms. Bernal, as well as Shirley Zajia; is that correct?

A.    **Can you scroll back up again? Thank you.  Yes, that's correct.**

Q.    Okay.  And so just for clarification, we know the other players, but who was Ms. Zajia?

A.    **Unfortunately, I don't know who Shirley was.  I'll have to check on details. I believe she was our HR business partner.**

Q.    Okay.  And what's the -- what is an HR business partner?  What is her -- their role?

A.    **Their -- their role is they sit within the HR organization and are essentially the -- the counterpart to senior leaders in the organization to support general HR activities, organization design and alignment, conflict resolution related activities.**

Q.    All right.  But regardless, this was an email that was sent to the head of HR, as well as the chief technical officer; is that correct?

A.    **That's correct.**

Q.    Okay.  So -- and Ms. Stewart wrote, as a reminder, we had agreed to a $600,000 retention for David Chu; is that correct?

A.    **She wrote that, yes.**

Q.    Okay.  And you see the word agreed?

A.    **I do.**

Q.    Okay.  What does agreed mean in -- in the context of such a document?

MS. HEISCHMIDT:  Objection.

THE WITNESS:  To my best --

MS. HEISCHMIDT:  You can answer.

THE WITNESS:  Okay.  To -- to my best interpretation, this would be -- this would be an ongoing business dialogue related to an internal alignment on what the team wanted to do as it relates to some sort of compen- -- compensation or special bonus structure for Mr. Chu.

Transcript of Steven McCree Lake, Corporate Designee    13 (49 to 52)
Conducted on January 21, 2026

there weren't sufficient details here. And while the general framework might have been agreed upon, nothing more formalized or structured was -- was in place at this time.

Q. Okay. But would you agree that between David and Julie, the milestones had been agreed upon?

A. I -- I would -- based on my reading, the -- the general framework of the milestones would have been agreed upon, but consistent with our practices, and all of these leaders would have known that additional details are needed. And that's visible from the perspective that Julie's even saying she doesn't have a way to track them, and that Vicky is noting that we haven't initiated additional activities to formalize it.

Q. Okay. But on this email, is there any mention about noteholder approval or approval from the board of directors or the -- or the comp committee?

A. There is not.

Q. Okay. All right. So moving on. So after just between December 16th, 2022, where Mr. Chu and -- accepts this particular arrangement, at least in his mind, and April 17, 2023, when he emails and checks on the status of the payment he's expecting, did anyone from Magic Leap tell Mr. Chu that this arrangement was -- was had -- was not formally approved?

A. To -- to my knowledge and reviewing the documents as best I can remember, and to my general awareness, there was no additional discussion with Mr. Chu given that there was no -- at least from Magic Leap's perspective, no formal agreement or expectations that we were going to be making any payments.

Q. Okay. And -- and as your testimony earlier was, there was no subsequent discussion other than this email between the people involved in human resources and Julie Green regarding the payment of their

retention?

A. To the best of my knowledge, unless I'm forgetting an email, there was no -- there was no discussion. There was no additional discussion. Unless there's another email, I'm not aware of any other dialogue about it.

Q. Okay. But you testified earlier that you reviewed all the documents in Magic Leap's document production; is that correct?

A. I did.

Q. Okay. All right. So prior to April 17, 2023, he was never told he might not be paid even if he completed his -- the milestones. Would that be accurate?

MS. HEISCHMIDT: Objection to form.

THE WITNESS: I'm reflecting on your question. I -- I think -- can -- can you restate the question one more time?

BY MR. HUANG:

Q. Sure. No, absolutely. So did anyone mention specifically to -- to Mr. Chu that, hey, even if you complete the milestones, you -- you might still not be paid? Would anyone mention that to him before his April 17th inquiry?

A. There -- to my knowledge, there was an additional discussion in that -- on that topic likely because there were not substantive, detailed milestones or a formalized agreement established. So it's unclear what -- what exactly would have been discussed. Particularly given that Mr. Chu also, I don't think, circled back to ask on the status or, you know, provide any progress updates.

Q. Okay. Let's pull up Exhibit 4.

THE TECH: Displaying Exhibit 4.

(Exhibit 4, Email, marked for identification.)

Q. All right. Sir, when you have a chance to read it, please -- read it. It's pretty short, but let me know when you finish

173

the future, and that's when you'd earn it.

Q. Why is it called deferred then?

A. Because you're -- you're essentially waiting until a certain point in the future to pay someone a bonus.

Q. Okay. So, but in this case, Mr. Chu had everything been approved. He had to hit certain milestones to earn this retention, correct?

A. He had to hit milestones to earn a bonus payment.

Q. The retention plan payment?

A. Well, it's called retention, but really, it's contingent upon him hitting the milestone and continued employment, so.

Q. Understood.

A. Yeah.

Q. Okay. I understand. You want to call it a bonus or not. But it's something that he has to do, and then he earns it, and then he's not paid until those -- those prerequisites are met, correct?

174

A. I think that's a difficult one to answer. I -- again, I'm not a lawyer, so I can't speak under the law.

What I can say practically is that from a HR perspective and from Magic Leap as a company's perspective, if someone earned something, we generally have some mechanism by which we have to record that either for tax purposes or financial accounting.

In cases like this one, there -- there was nothing recorded that he earned anything.

Q. Okay. And that's not what I'm asking, but -- and that's fine. But let me ask you this. Had David not delivered on the improved hand tracking, would he have been entitled to the $100,000 payment had everything else been in place?

A. If -- if he had delivered it or?

Q. Had not delivered, had not delivered it.

A. No, he wouldn't.

Q. So basically, he had to do that

175

in order to obtain the payment, had it been approved. Would you agree with that? Would you agree with that statement?

A. To -- to receive the payment, he would have had to deliver it, yes.

Q. Correct.

A. And continue to be employed.

Q. Understood. So, but here you also see then Shir- -- Shirley refers to it as a retention that was committed to him. What does that mean?

A. Based on all the content that we've reviewed and that I've read through, I -- I go back to the term that I shared earlier, which is that there was an alignment between leadership and discussion with Mr. Chu about a proposed bonus amount.

In this case associated with both retention and miles -- completing the milestones. And when it says committed here, my understanding and the way that I read that is that the discussions were such that

176

everyone was aligned.

However, I just want to reflect that there was never any formalization of any kind of agreement that would be consistent with every other bonus payment, retention, milestone, or otherwise outside of the -- the discretionary annual bonus that Magic Leap employees have received or received.

Q. But in this email chain, they don't refer to any- -- anything else. They don't refer to any sort of formalized document. You would agree?

A. They -- they don't refer to it because it's understood by everyone on the thread.

Q. Okay. All right. And it says -- she says also that in addition to being committed to David Chu, it was signed off by Jose Baltazar. What does sign off mean in this context?

A. Jose -- Jose or actually, anyone unilaterally on these email threads would not

Transcript of Steven McCree Lake, Corporate Designee
Conducted on January 21, 2026

have had the authority to formally instantiate that. It had to be in a document.

So what signed off, as I read it, means is he ultimately was comfortable with the amounts and the framework of the bonus, the retention and milestone bonus, and that, you know, there -- there had generally been alignment between all parties involved.

Q. Okay. So does signed off mean that he submitted to the -- the CEO?

A. I think signed off in this context means, based on my reading of the threads, means that he was, as the head of HR, comfortable with the constructs that were discussed.

Q. Okay. All right. So, but the head of HR had -- is referred to as signing off on this; is that correct?

A. Yes.

Q. Okay. I want you to look at an earlier email from Julie, April 17th. Do you see that email?

A. I -- oh, I see, at the top. Okay. Yes, I do.

Q. Okay. So it says, Jose committed this to him end of last summer, and separate from other retention concerns at a time. What is Magic Leap's knowledge regarding that statement?

A. To the best of my knowledge, from reading through the document, our position is that there -- similarly to all the other threads that we've discussed, is that there was alignment and discussion about a proposed retention and milestone bonus payment, but there was never any formalization of that agreement in a way that it was documented, accrued, entered into any finance or payroll system, entered into any HRAS system.

So our knowledge of this and our contention is that while there was alignment, clearly from all of the discussion, there was never any formalization, and everyone on the

thread and Mr. Chu would have known that had to be formalized in order to be ultimately be paid.

Q. I understand. I hear you. And you repeatedly stated that everyone would of known. What documents do you have? What Magic documents does Magic Leap have that would show that everyone should have known or should or had known of this requirement?

A. That there are documents related to our finance and payroll packages. I would argue that, you know, Mr. Chu and everyone else would have known, simply by the fact that his original employment agreement instantiated these things in the way that I'm discussing, terms and conditions, legal agreement.

He wasn't paid sign-on or deferred sign-on, or whatever we want to call it, without some kind of agreement. He would have also known because, at some point in these threads, he references that he knows of people in his team that are also receiving retention bonuses.

I checked on a few of those people. All of them have written, signed retention bonuses, and, you know, with -- with standard agreement language, either an amendment to their employment agreement or a separate agreement. No one is getting a bonus payment, earning a bonus payment, without all of these practices and approvals being in place.

And so, you know, I think that with all of that, he absolutely would of known that had to be the case. Everyone on this thread would have.

Q. Okay. Let me ask you this. Was Mr. Chu privy to those particular documents? Were those ever provided to him?

A. He references -- he references people on the team having those documents. He was certainly privy to his own employment agreement. So, I can't speak --

Q. That's not -- that's not what I asked. I asked, was he privy to these signed

referring to people's compensation packages, and -- and David was part of the pool of people she's referring to, correct?

MS. HEISCHMIDT: Objection. Form.

THE WITNESS: She said that she's -- she thought he was. All of the people, whoever they are in this group that she's referring to, I think confidently, they all had signed agreements to their -- either amendments to their employment agreements or some other separate agreement in place. Despite what she thought, David did not have that.

BY MR. HUANG:

Q. Okay. And those are documents you refreshed in preparation -- refreshed your memory in preparation for this deposition?

A. I -- I did my best to spot check some of the larger amounts that would've been commensurate or close to David, to ensure that, you know, that that was the case, and it was.

Q. Okay. Was it -- you're going to -- are you going to provide those documents for coun- -- to counsel?

A. I defer to counsel.

MS. HEISCHMIDT: We'll review if you have a request.

MR. HUANG: Absolutely. I mean, I think it's part of -- I'll supplement to get those documents.

MS. HEISCHMIDT: You can send over a request. We'll review it.

MR. HUANG: Yeah. Sure. All right.

BY MR. HUANG:

Q. But from what you understand, the -- these folks were in a similar boat, where not necessarily that they had -- they had approved agreements, but they were not receiving funds. Would you agree that's the scenario that Julie is describing prior to Jose fixing the situation?

A. No. It's a -- it's a -- an important question, so let me try to clarify.

So if -- if a person -- if an employee of Magic Leap has a signed and countersigned agreement through -- we use Docusign, then in that case, we -- we -- we're not not honoring our commitment to that employee in that agreement. It goes -- it goes through, you know, a process from an HR perspective, a payroll perspective, all the things. It's accrued for, it's accounted for. And if, based on the conditions of the signed agreement, if they are met, the payments are -- the bonus payments are made.

What I believe Julie is referring to here are scenarios where, in the thread I'm doing my best to interpret, and Magic Leap's position would be that she and Ibrahim are discussing compensation, people she's -- she's referring to maybe a few people who might have gotten competing offers at higher salaries. And then there's some adjustment that's happening. When she says he was able to fix them, what she means is got a structured agreement, signed, countersigned, in place, and then adjustments were made and paid based on meeting the terms of those agreements.

Q. So the way I understand, let me -- let me -- correct me if I'm wrong. She is -- she has presented a plan to Ibrahim as -- on behalf of the PIF, regarding employees who she had tried to submit, I guess, additional compensation or whatever else, and that he had yelled at her about because it's over -- it's too much based on his opinion. Is that accurate based on the first section of this email?

A. Just -- just to clarify. They did have a conversation, yes. But Julie wouldn't have been in a position -- and this wasn't just, I'm checking it to April. Julie did not have the authority to present a plan. What she -- and to ask for approval or anything like that.