EXHIBIT

E


Planet Depos

# Transcript of Sheri Bernal

**Date:** January 16, 2026
**Case:** Chu -v- Magic Leap, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

Transcript of Sheri Bernal
Conducted on January 16, 2026

1 (1 to 4)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------X

DAVID CHU,                      :

          Plaintiff,       :

        v.                 :Civil Action No.:

MAGIC LEAP, INC.           :1-25-cv-00574-RCL

          Defendant.       :

--------------------------------X

Deposition of SHERI BERNAL

Virtually Conducted

Friday, January 16th, 2026

11:30 a.m. (EST)

Job No.: 613573

Pages 1 - 117

Reported by: Stefanie Towns, CCR

Deposition of SHERI BERNAL, Conducted Virtually:

Pursuant to agreement, before Stefanie Towns, Notary Public in and for the District of Columbia.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

JEREMY HUANG, ESQUIRE

ROWE, WEINSTEIN & SOHN, PLLC

909 Rose Avenue

Suite 640

North Bethesda, Maryland 20852

301.761.3837

ON BEHALF OF DEFENDANT:

GIOVANNA BONAFEDE, ESQUIRE

CHRISTINA HEISCHMIDT, ESQUIRE

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP

8444 West Park Drive

Suite 510

McLean, Virginia 22102

703.245.9300

Also Present:

Dominic Merlo, Planet Depos Videographer

Ty Laird, Planet Depos Technician

C O N T E N T S

EXAMINATION OF SHERI BERNAL          PAGE

  By Mr. Huang                        6

E X H I B I T S

(Attached to the Transcript.)

PAGE

| 2 | Email 10-19-22 | 43 |
| 3 | Email 1-21-23 | 54 |
| 4 | Email 3-22-23 | 65 |
| 6 | Email 4-24-23 | 73 |
| 7 | Email 4-17-23 | 72 |
| 9 | RSU email | 108 |
| 10 | Email 4-25-23 | 57 |
| 11 | Google Vault Document | 39 |
| 13 | Email 12-16-22 | 32 |

Transcript of Sheri Bernal
Conducted on January 16, 2026

29

compensation?

A.    I'm sorry, offering and approving changes in compensation?

Q.    Employee compensation, yes.

A.    So when I was there the -- to offer compensation, we had ranges and structures that were in place and we would try to put people within those structures and make offers that were within those guidelines. If we needed to go outside of those guidelines, those decisions were escalated through leadership, as well as, to our -- our investors and our board. So we have defined process for that. For changes in someone's comp., you know, we do an annual cycle of review, and those are also, you know, heavily -- training goes out to the leaders, the whole process is kicked off, business partners and compensation books are involved in that, goes up through all of the leaders successively and then to the CEO, and then to our board of investors to sign off. So

30

that -- that's typically the process, I guess, I would say in terms of how we work through those things.

Q.    Okay. Let me ask you this, so would -- wouldn't you have to get -- wouldn't normally you have to get all those approvals before that's offered to the employee?

MS. BONAFEDE: Objection. Form. You can answer if you understand the question, Sheri.

A.    I'm not sure. Can you just repeat that, please?

Q.    Okay. So before a offer in terms of a change in compensation or a bonus plan, would that have to be approved first before it's offered to the employee?

A.    You know, I -- I would say that the process, again, to the point in theory is that nothing should be offered to an employee without going through that process. So that's how it's supposed to work.

Q.    Okay. All right. So I'd like to pull up --

31

let me ask you this, in terms of the approvals where are you sort of in this assembly line?

MS. BONAFEDE: Objection to form.

A.    Sorry, what did you say?

Q.    In terms of the approval process, are you part of the approval process?

A.    I -- I -- I would be on aggregate. So if you're -- if you're working on an offer for an admin who is going to support a team, you know, in Canada, that process is going to roll up with all those different layers and then before it goes to the CEO, I would definitely be looking at that. Or if there's an escalation or a question and somebody needs my help to try to look at something, I would be involved in that as the CHRO.

MR. HUANG: Okay. All right. I'd like to pull up Exhibit 13.

THE TECHNICIAN: Please stand by.

THE WITNESS: If you're going to -- as you pull something up, my eyesight isn't

32

super great on the laptop so just push my face a little. Please don't be alarmed, see my head up there close and personal.

THE TECHNICIAN: On screen.

(Exhibit 13 was marked for identification and is attached to the transcript.)

Q.    Okay. Ms. Bernal, are you able to view this easily? I want to make sure you understand, I guess, we're all on the same page.

THE WITNESS: Yeah. Can you just make it a little bit bigger, whoever's projecting it? Thank you. Sorry. That's perfect. Great.

Q.    All right. So this is an email chain from December 16th, 2022 do you recall if you were -- had started at Magic Leap by this point?

A.    I don't believe I had started yet. I don't believe I started yet. I literally was there for like a day and then everybody went out, you know, maybe a day or two and then everybody went out on holiday or something,