IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID CHU | * | |
| | * | |
|     Plaintiff, | * | |
| | * | Case No. 1:25-cv-00574-RCL |
| vs. | * | |
| | * | |
| MAGIC LEAP, INC. | * | |
| | * | |
|     Defendant. | * | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN
SUPPORT THEREOF**

TABLE OF CONTENTS

**INTRODUCTION**............................................................................................................... **1**

**LEGAL STANDARD**........................................................................................................ **2**

**ARGUMENT** ...................................................................................................................... **3**

    A.   VIRGINIA CONTRACT LAW APPLIES. ......................................................................... 3

        *1.   The PIIA's Venue Clause Is Broader Than Its Choice-of-Law Provision.*...................... *4*

        *2.   Under D.C. Choice-of-Law Rules, Virginia Has the Most Substantial Interest in the Dispute.* ...................................................................................................................... *4*

    B.   UNDER VIRGINIA LAW, THE DECEMBER 16, 2022, EMAIL EXCHANGE CREATED A VALID AND ENFORCEABLE CONTRACT. ..................................................................................... 5

        *1.   The Parties Manifested Mutual Assent Through a Clear Offer and Acceptance.*........... *6*

        *2.   The Agreement Was Supported by Valid Consideration and Definite Terms.* ................. *8*

        *3.   Magic Leap's Uncommunicated Contingencies Cannot Defeat Contract Formation.*.... *9*

        *4.   Post-Formation Conduct Confirms the Parties' Mutual Understanding.*..................... *13*

    C.   PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I: VIOLATION OF THE VIRGINIA WAGE PAYMENT ACT. ....................................................................................................... 15

        *1.   The Retention Bonus Constitutes "Wages" Under Virginia Code § 40.1-29*................ *16*

        *2.   Magic Leap Knowingly Failed to Pay Plaintiff's Wages.*............................................. *19*

    D.   PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II: BREACH OF CONTRACT.. 20

**CONCLUSION** ................................................................................................................. **21**

TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................2, 3

*Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999) ...........................................................................3

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ........................................................................2

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ...........................................................4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).......................................2

*Scott v. Harris*, 550 U.S. 372 (2007)...............................................................................................3

*Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191 (D.C. Cir. 1999) .......................4

*Williams v. First Gov't Mortg. & Investors Corp.*, 176 F.3d 497 (D.C. Cir. 1999) .........................4

<u>D.C. Cases</u>

*Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31 (D.C. 1989)............................................5

<u>Virginia Cases</u>

*Chittum v. Potter*, 216 Va. 463 (1975) ...........................................................................................10

*Coal Operators Cas. Co. v. C.L. Smith & Son Coal Co.*, 192 Va. 619 (1951)...............................13

*Dart Drug Corp. v. Nicholakos,* 221 Va. 989 (1981) ....................................................................13

*Filak v. George*, 267 Va. 612 (2004)..............................................................................................20

*Groundworks Operations, LLC v. Campbell*, Record No. 241092 (Va. Dec. 30, 2025)................16

*High Knob, Inc. v. Allen*, 205 Va. 503 (1964) ..............................................................................8, 9

*Lucy v. Zehmer*, 196 Va. 493 (1954) ..............................................................................................12

*Manss-Owens v. Owens & Son*, 129 Va. 183 (1921)......................................................................10

*Montagna v. Holiday Inns, Inc.*, 221 Va. 336 (1980)....................................................................5, 9

*Moorman v. Blackstock, Inc.*, 276 Va. 64 (2008) ..........................................................................10

*Sager v. Basham*, 241 Va. 227 (1991) ..................................................................................8

*Snyder-Falkinham v. Stockburger*, 249 Va. 376 (1995) ...................................................10

*Total Quality Logistics, LLC v. Riverside Turf, LLC*, No. 0009-22-2 (Va. Ct. App. Nov. 1, 2022) ...................................................................................................................................10

*Wells v. Weston*, 229 Va. 72 (1985) ...........................................................................5, 7, 13

Statutes

Va. Code § 40.1-2........................................................................................................15

Va. Code § 40.1-29......................................................................................... passim

Va. Code § 59.1-479......................................................................................................11

Va. Code § 59.1-485......................................................................................................11

29 C.F.R. § 778.211 ...........................................................................................22, 23, 24

Rules

Fed. R. Civ. P. 56(a) ....................................................................................................... 2

Other Authorities

Restatement (Second) of Conflict of Laws § 188............................................................4

DOLI Field Operations Manual, Ch. 10, § 9.00 (Rev. Mar. 2022)...................16, 17, 18

INTRODUCTION

This case concerns an employer's attempt to retroactively manufacture administrative excuses to avoid a binding compensation commitment. On December 16, 2022, Magic Leap's Head of Global Total Rewards, Victoria Stewart, emailed Plaintiff David Chu a concrete retention plan specifying quarterly payments of $100,000 for Year 1, tied to milestones to be defined by his direct supervisor, Magic Leap's Chief Technical Officer, Julie Larson-Green (the "December 2022 Retention Plan" or "Retention Plan"). SUMF ¶¶ 16-19. Chu accepted the offer in writing that same day, stating, "Let's do it," an acceptance Larson-Green immediately endorsed: "Happy to hear that! Looking forward to all we can accomplish together in 2023!" SUMF ¶¶ 20-21. Chu performed his obligations and completed the Q1 2023 milestone, a fact Magic Leap formally admits, yet the latter refuses to pay the retention bonus. SUMF ¶¶ 23, 31.

Magic Leap's refusal is supported only by a shifting array of post-hoc explanations: when Mr. Chu first sought payment in April 2023, he was told his retention was on hold pending a "job architecture initiative." SUMF ¶ 32. He was then told by then-Chief Human Resources Officer Sheri Bernal that funding of the plan had not been approved. SUMF ¶ 39. Then he was told by then-Chief Executive Officer Peggy Johnson that the arrangement was never "finalized" because it required a formal DocuSign document. SUMF ¶ 40. Now Magic Leap contends Amendment No. 7 to a Note Purchase Agreement required noteholder approval by Public Investment Fund of Saudi Arabia ("PIF"). SUMF ¶ 48.

This latest defense is a chronological and legal impossibility, as Amendment No. 7 was not even executed until February 1, 2023, nearly seven weeks after the contract was formed and accepted. SUMF ¶ 49. Magic Leap could not have been withholding a DocuSign in December 2022 pending a corporate governance hurdle that did not yet exist.

1

Furthermore, and most importantly, Magic Leap admits it never communicated any of these internal requirements to Chu. SUMF ¶ 55. Under the objective theory of contracts, unexpressed subjective intentions and uncommunicated internal administrative steps cannot defeat a clear manifestation of mutual assent.

Because the December 16 exchange created a binding agreement that Magic Leap knowingly breached, Mr. Chu is entitled to summary judgment on his Virginia Wage Payment Act claim, or in the alternative his breach of contract claim.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of some alleged factual dispute between the parties" will not defeat summary judgment; "the requirement is that there be no genuine issue of material fact." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law…An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmovant must point to evidence that would permit a reasonable jury to find in its favor, not merely "a scintilla of evidence." *Anderson*, 477 U.S. at 252. Evidence that is "merely colorable" or "not significantly probative" is insufficient. *Id.* at 249-50.

This standard has particular force where the nonmoving party relies on uncorroborated testimony that is contradicted by the contemporaneous documentary record. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The D.C. Circuit has likewise held that conclusory assertions offered without any factual basis cannot defeat a properly supported motion for summary judgment. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Here, Magic Leap's shifting, post-performance assertion that no agreement was finalized is blatantly contradicted by its own contemporaneous emails and no reasonable jury could credit Defendant's retroactive narrative.

ARGUMENT

## A.    Virginia Contract Law Applies.

Plaintiff initiated this lawsuit in the District of Columbia as required by Section 9(a) of the Proprietary Information and Inventions Agreement ("PIIA") that he executed at the start of his employment, which dictates the "exclusive venue of the state and federal courts located in the District of Columbia for any lawsuit filed by either party arising from or relating to this Intellectual Property Agreement." SUMF ¶ 5.

However, the substantive law of Virginia governs whether the parties formed a binding agreement regarding the December 2022 Retention Plan. This choice-of-law determination is dispositive for Plaintiff's breach of contract claim (Count II) and serves as the necessary predicate for his Virginia Wage Payment Act claim (Count I).

3

**1.      The PIIA's Venue Clause Is Broader Than Its Choice-of-Law Provision.**

While the PIIA's venue clause is broad, the PIIA's choice-of-law provision is drafted far more narrowly. The governing law clause states only that "[t]his Intellectual Property Agreement will be governed by the laws of the District of Columbia." By its own plain text, this clause is limited to the interpretation and enforcement of the PIIA itself, such as invention assignments and confidentiality, and does not extend to subsequent, standalone compensation contracts like the December 2022 Retention Plan. Because the Retention Plan lacks its own express choice-of-law provision, the Court must look to the forum's choice-of-law rules to determine the applicable substantive law.

**2.      Under D.C. Choice-of-Law Rules, Virginia Has the Most Substantial Interest in the Dispute.**

A federal court sitting in diversity applies the choice-of-law rules of the forum jurisdiction. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under D.C.'s choice-of-law rules, courts must determine which jurisdiction has the most substantial interest in the dispute. *See Williams v. First Gov't Mortg. & Investors Corp.*, 176 F.3d 497, 499 (D.C. Cir. 1999). Where a contract does not contain an effective choice-of-law provision, D.C. courts apply a "constructive blending" of the governmental interest analysis and the "most significant relationship" test to determine the applicable law. *Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 193-94 (D.C. Cir. 1999) (applying the standard to a breach of contract claim); *see also Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 41 n.18 (D.C. 1989). This framework requires the Court to evaluate the competing governmental policies and weigh the contract-specific factors outlined in Restatement (Second) of Conflict of Laws § 188, which

4

include the place of contracting, the place of performance, the location of the subject matter, and the domicile or residence of the parties.

Applying these factors, Virginia has the most substantial interest in the issue of contract formation. First, Plaintiff performed his work for Magic Leap exclusively from Virginia at all times relevant to this action, including the specific milestones Plaintiff completed to earn the retention payments. SUMF ¶ 4. Second, Plaintiff is a resident and citizen of Virginia. *Id.*

Finally, Virginia possesses a compelling governmental interest in regulating the payment of compensation for labor performed within its borders, as evidenced by its robust statutory framework protecting employees from wage withholding under the Virginia Wage Payment Act. The District of Columbia, by contrast, has no material interest in a compensation dispute between a Delaware corporation headquartered in Florida and a Virginia-based employee.

Because Virginia is the place of performance, the location of the subject matter, and the state whose policies are most directly implicated by the dispute, Virginia has the most substantial interest and therefore its law governs whether the parties' December 2022 email exchange formed a binding contract under both Count I and Count II.

**B.      Under Virginia Law, the December 16, 2022, Email Exchange Created a Valid and Enforceable Contract.**

A legally enforceable contract is formed when there is an offer, an acceptance, valuable consideration, and mutual assent to sufficiently definite terms. *Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346 (1980). Virginia adheres to the objective theory of contracts, meaning that the intention of the parties is determined by the outward expression of their words and acts, rather than any uncommunicated, subjective reservations. *Wells v. Weston*, 229 Va. 72, 78 (1985). Applying these bedrock principles to the undisputed facts, the parties formed a binding contract on December 16, 2022.

**1.    The Parties Manifested Mutual Assent Through a Clear Offer and Acceptance.**

*a.     Stewart's December 16 Email Constituted a Definite Offer.*

The December 16 email, described above, contained all the hallmarks of a definite offer, but Magic Leap will attempt to characterize this exchange as a preliminary negotiation or an invitation to discuss concepts. However, three features of the record foreclose that characterization.

First, the December 16 email was the product of months of prior negotiations that had already secured internal approvals. The retention plan originated in September 2022, when Chu raised the topic of retention compensation with Larson-Green. SUMF ¶ 7. Jose Baltazar, the then-Chief Human Resources Officer then initiated the formal process in early October 2022, obtaining CEO Peggy Johnson's approval for a proposed $400,000 retention package. SUMF ¶ 9. Chu rejected that initial proposal and negotiated for higher amounts. SUMF ¶ 10. The numbers were revised from $400,000 to $600,000 over the ensuing weeks. SUMF ¶ 11. The December 16 email with the $600,000 figure was therefore the culmination of a nearly three-month approval-and-negotiation process, not a first-pass concept. Stewart's statement that she was "circling back" confirms that she was returning to Chu after prior discussions, not initiating a new one.

Second, the email contained all material terms and invited acceptance, not further internal processing. The email identified the parties, specified the payment structure ($100,000 per quarter in Year 1), established the timeline (2023-2024), and defined the conditions for payment (milestones to be set by Larson-Green). SUMF ¶¶ 16-17. When Stewart asked Chu to "review the attached . . . and provide us with your feedback and/or any questions you might have", she did not say "this is a draft," "this is for discussion purposes only," or "this is subject to further approval." SUMF ¶ 19.

6

Third, Magic Leap's own corporate designee, Steven McCree Lake, confirmed the absence of any qualifying language. When asked whether the December 16 email chain contained any language indicating the offer was "conditional," McCree Lake answered: "No." SUMF ¶ 52. When asked whether it contained any language indicating the bonus was "discretionary," he again answered: "No, it does not." SUMF ¶ 53. When asked whether it mentioned Amendment No. 7 or noteholder approval, he answered: "It does not." SUMF ¶ 53. And when asked whether it mentioned "any sort of approval, like, a subsequent approval being needed," he answered: "It doesn't." SUMF ¶ 52. This series of admissions from Magic Leap's own 30(b)(6) witness establishes that, as a matter of undisputed fact, nothing in the December 16 communication signaled to Chu that the offer was anything other than a definite compensation proposal awaiting his acceptance.

### b.    *Chu Accepted and Larson-Green Endorsed the Agreement.*

That same day, Chu responded in writing: "Vicky, Jose and Julie, Thank you for providing the details here, and for investing in me. Let's do it." SUMF ¶ 20. The words "Let's do it" constitute an unequivocal manifestation of assent to the terms as presented, precisely the kind of objective expression that forms a contract under Virginia law. *See Wells*, 229 Va. at 78 (intention determined by "outward expression" of the parties' words).

Chu's direct supervisor, Larson-Green, confirmed the meeting of the minds by immediately acknowledging and endorsing the acceptance, replying: "Happy to hear that! Looking forward to all we can accomplish together in 2023!" SUMF ¶ 21.

**2.      The Agreement Was Supported by Valid Consideration and Definite Terms.**

        *a.        Consideration*

A contract is supported by consideration when there is a benefit to the promisor or a detriment to the promisee. *Sager v. Basham*, 241 Va. 227, 229 (1991). Here, Chu provided consideration by agreeing to remain with Magic Leap and to complete defined technological milestones within a specific timeframe, constituting obligations that exceeded his preexisting employment duties. Further, the retention plan was expressly designed to incentivize Chu "to remain with the employer" during a critical period of product development. SUMF ¶ 8. Magic Leap received the bargained-for benefit of retaining Chu and his completion of those milestones, and Chu's agreement to remain and perform under these circumstances constituted valuable consideration. SUMF ¶¶ 8, 22-23.

        *b.        Definite Terms*

A contract will not fail for indefiniteness if the terms permit a court to determine the exact obligations of the parties. *High Knob, Inc. v. Allen*, 205 Va. 503 (1964). Virginia law "does not favor declaring contracts void for indefiniteness and uncertainty, and leans against a construction which has that tendency," particularly "where there has been partial performance." *Id.* at 507. The December 16 agreement clearly identified: (a) the parties (Magic Leap would pay Chu); (b) the payment amounts ($100,000 per quarter in Year 1); (c) the timeline (quarterly payments spanning 2023-2024); and (d) the conditions (achievement of milestones to be defined by Larson-Green). SUMF ¶¶ 16-17.

That the specific contours of the technical milestones required subsequent definition by Larson-Green does not render the agreement unenforceable, because the parties agreed upon an objective mechanism for determining them: Larson-Green's discretion as Chu's supervisor.

SUMF ¶ 12. Virginia law permits parties to leave the specification of certain terms to the reasonable determination of one party, provided the contract contains a standard by which performance can be measured. *See Montagna*, 221 Va. at 346. Here, Larson-Green had the "authority to set the milestones," SUMF ¶ 12, and the parties understood that the milestones would be product-related deliverables. Furthermore, Larson-Green and Chu had already agreed upon the milestones on December 1, 2022, prior to the December 16, 2022 e-mail. SUMF ¶ 14.

Moreover, any theoretical indefiniteness argument is refuted by the parties' subsequent performance, as Virginia law dictates that even where the terms of an agreement are initially uncertain, subsequent performance by the parties can cure the indefiniteness by demonstrating a shared understanding of the contract's requirements. *See Montagna*, 221 Va. at 346; *High Knob*, 205 Va. at 507. Here, Chu completed the Q1 2023 milestone (shipping improved hand tracking), and Magic Leap has admitted this. SUMF ¶ 23. Magic Leap's own corporate designee attempted to characterize the milestones as "loose", but conceded that they were, in fact, "defined". SUMF ¶ 64. A party who has received the benefit of a contract and admitted that the counterparty satisfied its performance obligations cannot later claim the contract was too vague to enforce.

### 3. Magic Leap's Uncommunicated Contingencies Cannot Defeat Contract Formation.

Magic Leap attempts to defeat contract formation by invoking two contingencies that were never communicated to Chu: the absence of a formalized "DocuSign" document and the lack of external approval by noteholders pursuant to Amendment No. 7 to a Note Purchase Agreement. SUMF ¶¶ 42, 48, 55-58. Under Virginia law, neither defense survives summary judgment.

*a. The Absence of a DocuSign Is Irrelevant.*

As a threshold matter, the parties *do* have a written agreement. SUMF ¶ 16-19. Under Virginia law, correspondence between parties can form a binding contract if the communications, fairly construed, correctly express all of the terms to which the parties agree, "even though the parties understand that the agreement shall thereafter be expressed in a formal writing." *Chittum v. Potter*, 216 Va. 463, 467 (1975) (citing *Manss-Owens v. Owens & Son*, 129 Va. 183, 196 (1921)).

The Virginia Uniform Electronic Transactions Act (Va. Code § 59.1-479, *et seq.*) extends this principle to electronic communications, stating "[a] contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation," Va. Code § 59.1-485(b), and an electronic record satisfies any law requiring a writing, *id.* § 59.1-485(c). *See also Total Quality Logistics, LLC v. Riverside Turf, LLC*, No. 0009-22-2 (Va. Ct. App. Nov. 1, 2022) (holding that a series of emails setting out price, dates, and other terms constituted a binding contract). Stewart's December 16 email, sent from her corporate email address in her capacity as Head of Global Total Rewards, containing specific terms, an attached spreadsheet with exact payment amounts, and her typed name and title, constitutes a signed electronic record. SUMF ¶¶ 16-19. Chu's written acceptance ("Let's do it") and Larson-Green's written endorsement ("Happy to hear that!") further confirm the agreement in electronic form. SUMF ¶¶ 20-21.

Even if the Court were to conclude that the email exchange does not constitute a sufficient signed writing, Virginia law does not require a formal written instrument to finalize an agreement unless all parties expressly intend that no contract shall exist until such a document is executed. *Snyder-Falkinham v. Stockburger*, 249 Va. 376, 385 (1995). The intent to require a formal document must be communicated; uncommunicated internal expectations cannot bind a counterparty. *Id.* Magic Leap may invoke the presumption recognized in *Moorman v. Blackstock,*

*Inc.*, 276 Va. 64, 71 (2008), that no contract exists until a formal document is signed where the parties so intend. But that presumption arises only where *both* parties share the intent to culminate their agreement with a signed contract and here, the undisputed record establishes that no one communicated any such intent to Chu. SUMF ¶ 55.

Instead, Magic Leap permitted Chu to perform the milestones in reliance on the agreement without any disclosure that the arrangement was supposedly not yet effective. SUMF ¶¶ 22-23, 55. Moreover, Magic Leap's own internal practices confirm that the DocuSign was an administrative formality, not a precondition to contract formation. Stewart testified that DocuSign documents were generated only "once all the approvals are in place", but her own handling of another employee's retention plan tells a different story. SUMF ¶ 44-47.

On November 30, 2022, just weeks before the December 16, 2022 email to Chu, Stewart emailed Baltazar reporting that she had obtained approval from Magic Leap's then CEO and CFO for a retention plan for employee John Monos. SUMF ¶ 45. Within two hours, Stewart was already "working . . . on getting the information in SF and subsequently a document for Monos to sign." SUMF ¶ 45. At that point, shareholder approval had not been obtained, and Monos himself had not even reviewed the proposal, as his manager still needed to "have the conversation" with him. SUMF ¶ 46. Monos ultimately did not accept the proposal and left the company. SUMF ¶ 47. Stewart was thus generating a DocuSign document before the employee had even reviewed the proposal, undermining Magic Leap's central contention that the December 16 email to Chu was merely a preliminary "framework" or "proposal" that required employee acceptance before formal documentation could be generated. SUMF ¶ 44-47.

11

       b.    *Amendment No. 7 Cannot Retroactively Defeat a Contract Formed Before the Amendment Existed.*

Magic Leap's remaining defense is that the retention plan required approval from noteholders under Amendment No. 7 to the Note Purchase Agreement before it would become binding. SUMF ¶ 48.

However, Magic Leap failed to include an important detail in those discovery responses: Amendment No. 7 did not exist when the contract was formed, as it is dated February 1, 2023, nearly seven weeks after the December 16, 2022 email exchange. SUMF ¶ 49. Magic Leap's corporate designee conceded that the amendment "didn't exist at the time that offer was—or that discussion existed." SUMF ¶ 50. As a contract's validity is determined at the time of formation, s*ee Lucy v. Zehmer*, 196 Va. 493, 503 (1954), an investor agreement executed weeks after contract formation cannot retroactively impose conditions on an already-formed agreement.

       c.    *Magic Leap's Uncommunicated Internal Requirements Cannot Defeat Contract Formation*

Even if Plaintiff were to concede that the DocuSign and Amendment No. 7 approvals were required, no one communicated any such approval requirement to Chu. SUMF ¶ 55. A private board or investor approval process is a back-office constraint, not a contract term, when never communicated to the counterparty. Even Larson-Green, Chu's direct supervisor and the person responsible for the milestones, "was unaware that his retention was conditional on some future retention process." SUMF ¶ 54. In its discovery responses, Magic Leap asserts that "Plaintiff was aware" of the noteholder requirement but identifies no communication, written or oral, in which that requirement was disclosed to Chu. SUMF ¶¶ 55-56.

Additionally, Magic Leap has never maintained a written policy informing employees that retention plans are subject to noteholder or any other external approval. SUMF ¶ 57. When

asked to identify any written policy to this effect, neither Magic Leap's corporate designee nor Baltazar, the CHRO at the relevant time, could. *Id.* In fact, when Bernal was asked about whether employees were informed about the note-holder approval requirement, she stated, "I don't think we typically advertised that", as "nothing should be offered to an employee without going through that process." SUMF ¶ 58. An employer cannot simultaneously maintain no written policy, fail to disclose its internal requirements, present specific compensation terms to an employee, and then assert the employee "should have known" about undisclosed conditions. Under the objective theory of contracts, what Chu "should have known" is irrelevant, and what matters is what was communicated to him. *Wells*, 229 Va. at 78.

### 4.    Post-Formation Conduct Confirms the Parties' Mutual Understanding.

Even if the Court were to find any ambiguity in the parties' December 16 exchange, the post-formation conduct of both parties confirms that they understood a binding agreement existed. Under Virginia law, when contract terms are "doubtful or uncertain, the interpretation placed thereon by the parties themselves is entitled to great weight and will be followed." *Dart Drug Corp. v. Nicholakos*, 221 Va. 989, 995 (1981); *accord Coal Operators Cas. Co. v. C.L. Smith & Son Coal Co.*, 192 Va. 619, 626 (1951) ("[t]he practical construction of a contract by the parties themselves is entitled to great weight in determining its proper interpretation").

For the longest while, Magic Leap treated the retention as an existing commitment. SUMF ¶¶ 25-30. On January 21, 2023, Stewart wrote to Larson-Green, Baltazar, and Bernal, "As a reminder, we had *agreed* to a 600,000 retention for David Chu." SUMF ¶ 25 (emphasis added). She did not hedge this language with "proposed", "tentative", or "pending approval". When confronted with her own language at deposition, Stewart confirmed: "We had agreed to the 600k." *Id.*

13

Later, in March 2023, Larson-Green treated the retention as a debt coming due, writing to Stewart, "I think we owe David Chu his quarterly retention payment at the end of the month. Are we on track to do that?" SUMF ¶ 26. When Stewart responded that the retention had been "rolled into" a broader plan pending approval, Larson-Green objected: "I am pretty sure his agreement started in Q1, not Q2. I am sure he will ask me about it soon. What do I tell him?" SUMF ¶¶ 27-28. Stewart then confirmed: "Once approved, he will receive the full amount of what we discussed with him but the timing might be off slightly." SUMF ¶ 29. As of only a little over a week before the end of Q1 2023, Magic Leap's own Head of Total Rewards was assuring the CTO that Chu would receive "the full amount", indicating that she agreed that the obligation was valid, but that only the timing of payment might shift. *Id.*

Subsequently, on April 11, 2023, Shirley Zajia, Magic Leap's Director of HR Business Partners, wrote to Bernal and Stewart after meeting with Larson-Green, "David Chu - Based on commitment approved by Jose B., he is due payment this month." SUMF ¶ 30. Zajia, an HR professional with no involvement in the original negotiation, independently characterized the retention as a commitment that had been made, authorized, and due for payment. *Id.*

Chu, for his part, performed by completing the Q1 2023 milestone of shipping improved hand tracking, without anyone from Magic Leap ever suggesting to him that the agreement was not in effect. SUMF ¶¶ 22-24; 56. It was only after Chu inquired about his payment on April 17, 2023, that Magic Leap disclosed any issue at all, telling him for the first time that his retention plan had been put "on hold." SUMF ¶¶ 32-33. Internally, Bernal confided in Larson-Green that the "only reason" she could not pay Chu was because the PIF denied funding, not that no agreement existed. SUMF ¶¶ 34-36. Bernal even explored alternative forms of compensation, including equity and stock options, to satisfy the obligation when cash funding appeared

14

uncertain. SUMF ¶ 38. An employer does not seek alternative means of payment for an obligation it does not believe exists.

Only after these efforts failed did Magic Leap adopt its current position that no obligation existed at all. SUMF ¶ 40.

Because a valid and enforceable contract was formed on December 16, 2022, and Magic Leap admits it has failed to pay Plaintiff despite his completion of the Q1 2023 milestone, we now turn to whether Magic Leap's failure to honor that contract also violates the Virginia Wage Payment Act.

**C.    Plaintiff Is Entitled to Summary Judgment on Count I: Violation of the Virginia Wage Payment Act.**

As a threshold matter, Mr. Chu and Magic Leap satisfy the statutory definitions of "employee" and "employer" under the Virginia Wage Payment Act, Va. Code § 40.1-29 (the "Act"). Va. Code § 40.1-2 defines "employee" as "any person who, in consideration of wages, salaries or commissions, may be permitted, required or directed by any employer to engage in any employment directly or indirectly." An "employer" is any "corporation . . . doing business in or operating within this Commonwealth who employs another to work for wages, salaries, or on commission." *Id.*

Magic Leap is a corporation that employed Mr. Chu to work for a salary from its operations in Virginia, and Mr. Chu performed all of his work from Fairfax County, Virginia, at all times relevant to this action. SUMF ¶¶ 2-4. Magic Leap's own Employment Offer Letter hired Mr. Chu as Vice President of Software Engineering at an annual salary of $330,000, SUMF ¶ 3, and Magic Leap's corporate designee, discovery responses, and every witness deposed in this case referred to Mr. Chu as a Magic Leap employee.

15

The Act provides that "[u]pon termination of employment an employee shall be paid all wages or salaries due him for work performed thereto." Va. Code § 40.1-29(A). Since 2020, subsection (J) creates a private right of action allowing an employee to bring suit against "an employer [who] fails to pay wages to an employee in accordance with this section…to recover payment of the wages." Va. Code § 40.1-29(J).

To prevail on his claim under the Act, Plaintiff must establish that: (1) the retention bonus constitutes "wages" under the Act; and (2) the bonus was earned and due. If Plaintiff further establishes that Magic Leap's failure to pay was "knowing," the Court "shall award the employee an amount equal to triple the amount of wages due and reasonable attorney fees and costs." Va. Code § 40.1-29(J). Each element, including the knowing enhancement, is established by the undisputed record.

### 1.    The Retention Bonus Constitutes "Wages" Under Virginia Code § 40.1-29.

As a preliminary matter, the Act itself does not define "wages"; The Virginia Department of Labor and Industry ("DOLI") Field Operations Manual, the guidance document of the agency charged with enforcing the Act, provides a detailed framework for classifying bonuses under the statute, distinguishing discretionary bonuses (which are not wages) from non-discretionary bonuses (which "may be considered wages and can be collected" under § 40.1-29). *See* Exhibit K: DOLI Field Operations Manual, Chapter Ten, § 9.00. This framework is consistent with the Virginia Supreme Court's recent definition of "wages" as "payment for labor or services, usually based on time worked or quantity produced." *Groundworks Operations, LLC v. Campbell*, Record No. 241092, slip op. at 5 (Va. Dec. 30, 2025) (quoting Black's Law Dictionary 1898 (12th ed. 2024)). Plaintiff's milestone compensation, a fixed $100,000 for shipping a specific technical deliverable, is payment for services based on output produced. As set forth below, the

16

DOLI Manual's framework and the undisputed record confirm that this compensation constitutes a non-discretionary wage under the Act.

§ 9.00 of the DOLI Manual identifies a non-discretionary bonus by four characteristics:

1) The employer promises to pay a sum in advance, and the sum is related to work to be performed.

2) The employer determines how the sum amount will be derived prior to payment.

3) The sum is promised to employees as a result of a contract, either implied or written.

4) The sum is promised as an incentive to cause the employee to work more steadily, more efficiently, more rapidly, to remain with the employer, etc.

*Id*. § 9.00(B). Plaintiff's retention bonus satisfies every element: Magic Leap promised in advance to pay $100,000 per quarter, tied to the completion of specific technical milestones. SUMF ¶¶ 16-17. The amount was fixed before any work was performed. *Id*. The sum was promised pursuant to a written exchange constituting an agreement between employer and employee. SUMF ¶¶ 16-21. And the plan was expressly designed as an incentive to cause Plaintiff to remain with the company during a critical period of product development, with Larson-Green confirming that Magic Leap "couldn't afford to lose him given the work he is responsible for" and that the plan was designed to incentivize Plaintiff "to remain with the employer." SUMF ¶ 8.

The federal framework reaches the same result. Under 29 C.F.R. § 778.211(b), a bonus is discretionary only where "the employer must retain discretion both as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus is paid" and the bonus is "determined by the employer without prior promise or agreement." The regulation is explicit: "If the employer promises in advance to pay a bonus, he has abandoned his discretion

17

with regard to it." Id. Moreover, "[b]onuses which are announced to employees to induce them to work more steadily or more rapidly or more efficiently or to remain with the firm are regarded as part of the regular rate of pay." Id. § 778.211(c). Magic Leap promised in advance to pay a fixed sum as an incentive both to retain Chu and to incentivize the accelerated delivery of specific work output. SUMF ¶¶ 8, 13, 16-17. Magic Leap retained no discretion over the fact of payment or the amount, as both were fixed in advance, contingent only on milestone achievement.

Magic Leap's own corporate designee admitted under oath that the December 16, 2022 email contained no language indicating the bonus was "discretionary." SUMF ¶ 53. No one at Magic Leap ever communicated to Chu that his retention bonus was discretionary. SUMF ¶ 55. Magic Leap's designee conceded that completing the Q1 2023 milestone would have triggered the $100,000 payment. SUMF ¶ 63. Magic Leap argues its Compensation Committee retains "ultimate discretion" over payouts (SUMF ¶ 59), but this conflates an employer's unilateral decision to withhold payment with a contractual right to do so. The record shows Magic Leap offered a fixed $100,000 contingent on a specific milestone, without reserving the right to cancel. SUMF ¶¶ 16-19; 55. Upon Chu's acceptance, the bonus became legally non-discretionary. See 29 C.F.R. § 778.211(b); DOLI Manual § 9.00(A). Both of Magic Leap's post-hoc justifications fail: the lack of a DocuSign is a foreclosed formation defense, not a discretion defense (See Section B.3, supra), and refusing to pay due to post-hoc investor funding restrictions (SUMF ¶¶ 48-51), rather than Chu's performance, cannot retroactively convert a non-discretionary bonus into a discretionary one.

To the extent Magic Leap attempts to import the language from Chu's July 2021 Employment Offer Letter, which states that performance bonuses are paid "at the sole discretion of the Company," that provision governs the annual bonus program, not the 2022 Retention Plan.

18

SUMF ¶¶ 3, 61-62. Magic Leap's own witnesses drew this distinction in unequivocal terms: Stewart testified that the annual bonus is "completely separate" from a retention plan, that a retention plan is "a direct agreement between the individual and the company that says you must achieve X, Y, Z in order to receive this payment." SUMF ¶ 61. McCree Lake likewise testified that the annual bonus and retention plan "are distinct": the annual bonus is "discretionary," while a retention plan involves "a specific agreement, details related to how it's going to be assessed, other types of conditions." SUMF ¶ 62.

### 2. Magic Leap Knowingly Failed to Pay Plaintiff's Wages.

Va. Code § 40.1-29(K) provides that an employer acts "knowingly" where it "(i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information."

Magic Leap's failure to pay was knowing under any of these prongs. Magic Leap had actual knowledge that it had communicated a retention plan to Chu, that Chu had accepted, and that Chu had completed the Q1 2023 milestone. SUMF ¶¶ 16-24. Green, the person responsible for confirming milestone achievement, stated on April 25, 2023, the very period Magic Leap was deciding not to pay, "He has delivered on his milestone for Q1 and is on track for Q2." SUMF ¶ 24.

Despite this knowledge, Magic Leap refused to pay. SUMF ¶¶ 24-41. When Chu inquired about his bonus on April 17, 2023, he was told for the first time that his retention plan had been put "on hold." SUMF ¶ 32. Green captured the broader pattern: "Each time we create a list, folks are implicitly promised something is on the way. I personally need to stop being part of the charade and just level with people that what they have is what they have and not lead them on."

19

SUMF ¶ 37. This is an employer acknowledging, through its own CTO, that it systemically made compensation promises to its employees and then failed to honor them. *Id.*

Magic Leap's refusal was not based on any good-faith dispute about whether the bonus was owed but rather, as the undisputed record demonstrates, it decided, after investor restrictions tightened in early 2023, that it would not honor commitments made before those restrictions took effect. SUMF ¶¶ 25-30, 36. This is, at minimum, deliberate ignorance or reckless disregard of its obligation to pay Chu the wages it had promised.

Accordingly, Plaintiff is entitled to treble damages, prejudgment interest at 8%, and reasonable attorney's fees and costs under Va. Code § 40.1-29(J).

**D.      Plaintiff Is Entitled to Summary Judgment on Count II: Breach of Contract.**

In the alternative, Plaintiff seeks summary judgment on his breach of contract claim. Under Virginia law, a breach of contract claim requires: (1) a legally enforceable obligation of the defendant to the plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach. *Filak v. George*, 267 Va. 612, 619 (2004).

Each element is established by the undisputed record: as demonstrated in Section III.B, *supra*, a valid and enforceable contract was formed on December 16, 2022, when Stewart communicated the retention plan, Chu accepted, and Green endorsed the arrangement. SUMF ¶¶ 16-21. The material terms of $100,000 per quarter beginning in 2023 conditioned on milestones defined by Green, were sufficiently definite, and Magic Leap's post-hoc defenses based on Amendment No. 7 and the absence of a DocuSign fail as a matter of law. SUMF ¶¶ 16-17; 64.

As to the second and third elements, there is no genuine dispute that Chu performed his obligations by completing the Q1 2023 milestone of shipping improved hand tracking, and Magic Leap has admitted that it has not paid Chu any portion of the milestone bonus amounts.

20

SUMF ¶¶ 22-23, 31. Accordingly, Magic Leap has breached its contract with Chu and is obligated to pay $100,000 for the Q1 2023 milestone achievement.

CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his motion for summary judgment on both Count I (Virginia Wage Payment Act) and Count II (Breach of Contract) and award:

a.      On Count I: an award of $300,000.00 (triple the $100,000.00 in wages due), with prejudgment interest at 8% accruing from March 31, 2023, pursuant to Virginia Code § 40.1-29(J), plus reasonable attorney's fees and costs pursuant to Virginia Code § 40.1-29(J); or, in the alternative, partial summary judgment establishing Defendant's liability under the Virginia Wage Payment Act and awarding $200,000.00 (double the $100,000.00 in wages due), with prejudgment interest at 8% accruing from March 31, 2023, and reasonable attorney's fees and costs pursuant to Virginia Code § 40.1-29(J), with the knowing enhancement reserved for determination at trial;

b.      On Count II, in the alternative: an award of $100,000.00, with interest at the judgment rate from March 31, 2023, plus reasonable attorney's fees and costs; and

c.      Such other and further relief as this Court deems just and proper.

Respectfully submitted,

ROWE WEINSTEIN & SOHN, PLLC

*/s/ Jeremy C. Huang*
Jeremy C. Huang (D.C. Bar No. 1000849)
909 Rose Avenue, Suite 640
North Bethesda, MD 20852
Telephone: (301) 761-3837
jhuang@rowepllc.com
*Counsel for Plaintiff David Chu*

21

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23rd day of March 2026, a copy of the foregoing Motion for Summary Judgment, Statement of Undisputed Material Facts, and Exhibits were served via the Court's ECF system upon the following persons:

Christina M. Heischmidt (DC Bar No. 1006759)
Giovanna R. Bonafede (DC Bar No. 90011443)
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
8444 Westpark Drive - Suite 510
McLean, Virginia 22102
*Counsel for Defendant Magic Leap, Inc.*

*/s/ Jeremy C. Huang*

22