**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DAVID CHU | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No. 1:25-cv-00574-RCL |
| vs. | * | |
| | * | |
| MAGIC LEAP, INC. | * | |
| | * | |
| Defendant. | * | |

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(h), Plaintiff David Chu respectfully submits the following

Statement of Undisputed Material Facts in support of his Motion for Summary Judgment.

**A.     Background and Employment Relationship**

1.     Magic Leap, Inc. is a corporation organized under the laws of Delaware with its

principal place of business in Florida. Compl. ¶ 2; Answer ¶ 2.

2.     Magic Leap employed Plaintiff David Chu as Vice President, Software

Engineering, commencing July 26, 2021.  **Exhibit F: Excerpts from Defendant's Document**

**Production,** DEF_000008.

3.     Plaintiff's annual base salary was $330,000, with an annual performance bonus to

be paid "at the sole discretion of the Company". Exhibit F at DEF_000008-000009.

4.     At all times relevant to this action, Plaintiff was a resident and citizen of the

Commonwealth of Virginia and performed all of his work for Magic Leap exclusively from

Fairfax County, Virginia. **Exhibit A: Chu Declaration** ¶ 4.

5.     The Proprietary Information and Inventions Agreement ("PIIA") executed at the

start of Plaintiff's employment contains a forum selection clause providing for "exclusive venue

of the state and federal courts located in the District of Columbia for any lawsuit filed by either party arising from or relating to this Intellectual Property Agreement." Exhibit F at DEF_000016.

6.     The PIIA's choice-of-law provision states only that "[t]his Intellectual Property Agreement will be governed by the laws of the District of Columbia." Exhibit F at DEF_000016.

**B.     Negotiation and Formation of the Retention Agreement**

7.     In approximately September 2022, Plaintiff raised the topic of retention compensation with his direct supervisor, Chief Technology Officer Julie Larson-Green. Exhibit F, DEF_000153 (Larson-Green April 25, 2023 email: "Jose started the process with him in early October (after David raised it with me in last September), well before the talk of any wider retention program."); Exhibit A, ¶ 6.

8.     Larson-Green stated that at the time the retention plan was offered, Magic Leap "couldn't afford to lose him given the work he is responsible for with [N]vidia and the importance to the business," and the plan was designed to incentivize Plaintiff "to remain with the employer." Exhibit F at DEF_000153.

9.     In early October 2022, Jose Baltazar, Magic Leap's Chief Human Resources Officer, initiated the formal retention process and obtained approval from CEO Peggy Johnson for a proposed $400,000 retention package for Plaintiff. **Exhibit C: Deposition of Jose Baltazar (excerpts)** 30:3-11; **Exhibit B: Deposition of Victoria Stewart (excerpts)** 57:6-9; Exhibit F at DEF_000122-123.

10.     Plaintiff rejected the initial $400,000 proposal and negotiated for higher amounts. Exhibit C at 59:16-18 ("David negotiated and didn't agree, so we had to go back and redo the numbers").

11.     The retention plan figures were revised from $400,000 to $600,000 over the ensuing weeks as a result of Plaintiff's negotiations. Exhibit C at 60:16-18 ("from October all the way to December, since the numbers change is because he was negotiating").

12.     Larson-Green had the "authority to set the milestones" for Plaintiff's retention plan. Exhibit B at 124:1-3; **Exhibit E: Deposition of Steven McCree Lake (excerpts)** at 55:4-14.

13.     The retention plan was designed so that Plaintiff would produce those milestone deliverables sooner than they would have otherwise been otherwise, rather than merely performing his regular duties. Exhibit B at 131:17-21; 132:14-18.

14.     On or about December 1, 2022, prior to finalizing the agreement, Plaintiff and Larson-Green discussed and agreed upon milestone concepts, including: "Q[N]. Ship improved hand tracking; Q[N+1]. Ship AR Cloud Dense Map Merge for Digital Twins; Q[N+2]. Ship Omniverse Private Beta; Q[N+3]. Ship new cloud perception capabilities." Compl. Ex. C, ECF No. 1-5; **Exhibit I: Defendant's Responses to Plaintiff's First Set of Requests for Admissions** No. 19 (admitting authenticity).

15.     Larson-Green reviewed and approved the milestone concepts, responding: "Looks good to me!" Compl. Ex. C, ECF No. 1-5; Exhibit I at No. 19 (admitting authenticity).

16.     On December 16, 2022, Victoria Stewart, Magic Leap's Head of Global Total Rewards, emailed Plaintiff a retention plan stating: "We are circling back with a retention plan that provides quarterly payments over the next two years (2023-2024). The plan is designed for more in Year 1 vs. Year 2 and will have key milestones, as defined by Julie, associated with the payouts." Compl. Ex. D, ECF No. 1-6; Exhibit I at No. 20 (admitting authenticity).

17.     Stewart attached a password-protected spreadsheet, "Compensation_Retention_DChu.xlsx," specifying exact payment amounts of $100,000 per quarter in Year 1 and a total value of $600,000 over two years. Compl. Ex. D, ECF No. 1-6; Exhibit I at No. 20 (admitting authenticity).

18.     The December 16, 2022 email was sent to Plaintiff and copied to Jose Baltazar, Magic Leap's Chief Human Resources Officer, and Julie Larson-Green, Magic Leap's Chief Technology Officer and Plaintiff's direct supervisor. Compl. Ex. D, ECF No. 1-6; Exhibit I at No. 20 (admitting authenticity).

19.     Stewart asked Plaintiff to "review the attached . . . and provide us with your feedback and/or any questions you might have." DEF_000155. The email did not state that the plan was a "draft," "for discussion purposes only," or "subject to further approval." Compl. Ex. D, ECF No. 1-6; Exhibit I at No. 20 (admitting authenticity); Exhibit E at 30:6-20.

20.     On December 16, 2022, Plaintiff responded in writing: "Vicky, Jose and Julie, Thank you for providing the details here, and for investing in me. Let's do it." Compl. Ex. D, ECF No. 1-6; Exhibit I at No. 20 (admitting authenticity).

21.     Later that same day, Larson-Green endorsed the acceptance, replying: "Happy to hear that! Looking forward to all we can accomplish together in 2023!" Compl. Ex. D, ECF No. 1-6; Exhibit I at No. 20 (admitting authenticity).

## C.     Plaintiff's Performance of the Agreed Milestones

22.     The Q1 2023 milestone required Plaintiff to ship improved hand tracking. Compl. Ex. C, ECF No. 1-5; Exhibit I at No. 19 (admitting authenticity); Exhibit A, ¶ 13.

23.　　　Plaintiff completed the Q1 2023 milestone. **Exhibit H: Defendant's Answers to Plaintiff's First Set of Interrogatories**, Answer No. 7 (Magic Leap admitting "Plaintiff completed the Q1 performance milestone").

24.　　　On April 25, 2023, Larson-Green confirmed Plaintiff's milestone completion, stating: "He has delivered on his milestone for Q1 and is on track for Q2." Exhibit F at DEF_000153. Larson-Green further confirmed that Plaintiff's milestones were "product milestones, which he excels at." *Id.*

**D.　　　Magic Leap's Internal Acknowledgments of the Agreement**

25.　　　On January 21, 2023, Stewart wrote to Larson-Green, Baltazar, and Sheri Bernal (Magic Leap's incoming Chief Human Resources Officer): "As a reminder, we had agreed to a $600,000 retention for David Chu." Exhibit F at DEF_000217. When confronted with this language at deposition, Stewart confirmed: "We had agreed to the 600k." Exhibit B at 62:2.

26.　　　On March 21, 2023, Larson-Green wrote to Stewart: "I think we owe David Chu his quarterly retention payment at the end of the month. Are we on track to do that?" **Exhibit G: Excerpts from Defendant's Confidential Document Production**, DEF_000270.

27.　　　Stewart responded the following day stating that Chu's retention "was rolled into the Retention Plan that is still pending final approval with the hope we can proceed with providing agreements to the selected participants in Q2." Exhibit G at DEF_000270.

28.　　　Larson-Green objected, "I am pretty sure his agreement started in Q1, not Q2. I am sure he will ask me about it soon. What do I tell him?" Exhibit F at DEF_000121.

29.　　　Stewart then confirmed: "Once approved, he will receive the full amount of what we discussed with him but the timing might be off slightly." Exhibit F at DEF_000121.

30.     On April 11, 2023, Shirley Zajia, Magic Leap's Director of HR Business Partners, wrote to Bernal and Stewart after meeting with Larson-Green, "David Chu - Based on commitment approved by Jose B., he is due payment this month." Exhibit F at DEF_000093.

**E.     Magic Leap's Refusal to Pay and After-the-Fact Justifications**

31.     Magic Leap did not pay Plaintiff any portion of the retention bonus. Exhibit I at No. 9.

32.     When Plaintiff inquired about his retention payment on April 17, 2023, Stewart responded on April 24, 2023: "Your target retention we had discussed was part of the broader Retention Plan that has been placed on hold at this time, pending the outcome of the Job Architecture initiative that is underway." Exhibit F at DEF_000146; Exhibit B at 87:18-88:5.

33.     Plaintiff was never previously told that his retention bonus was beholden to any Job Architecture Initiative. Exhibit A, ¶ 14; Exhibit B at 88:7-20.

34.     Despite this statement that the retention was "on hold", Bernal admitted to Larson-Green on April 24, 2023 that "We don't have any retention here for him specifically. We are assuming we will work the retention program, as well as possible alternatives (equity, shadow stock etc) in parallel with this and target to have decision by end of JA." Exhibit F at DEF_000158.

35.     Larson-Green was surprised and taken aback, stating "Revisiting his retention as part of a new retention plan doesn't seem right given that he received paperwork on what to expect over 6 months ago…To me this is another integrity thing and not following through with what we say we are going to do. David and I were both unaware that his retention was conditional on some future retention process. We had given retention to others around this

timeframe and it was not made clear that this would be any different. Jose started the process with him in early October (after David raised it with me in last September), well before the talk of any wider retention program. I have many mails on this and it is beyond disappointing that we are not keeping our word." Exhibit F at DEF_000158.

36.     Bernal responded to Larson-Green's complaint stating, "The only reason I cannot offer him the bonus is because we do not have bonus dollars from the P[ublic] I[nvestment] F[und of Saudi Arabia]. It was not approved by them and I was told flat out: no." Exhibit F at DEF_000157.

37.     Larson-Green responded by lamenting a broader pattern of Magic Leap making and then failing to honor compensation commitments, stating, "Each time we create a list, folks are implicitly promised something is on the way. I personally need to stop being part of the charade and just level with people that what they have is what they have and not lead them on." Exhibit F at DEF_000208.

38.     Bernal met with Chu later that day and discussed with him alternative forms of compensation, including equity and stock options, to satisfy the obligation when cash funding appeared uncertain. **Exhibit D: Deposition of Sheri Bernal (excerpts)** at 94:13-20; Exhibit F at DEF_000205.

39.     Rather than admitting that the PIF had flat out told her no, Bernal instead told Chu that they did not have approval on funding, and that the investor had "asked us to hold off until after J[ob] A[rchitecture]." Exhibit F at DEF_000126. Exhibit D at 94:21-96:2.

40.     Plaintiff later met with CEO Peggy Johnson who told him that the retention agreement was not valid as there was never a formally signed document. Exhibit A, ¶ 16.

41.     Despite this, Bernal admitted at her deposition that there was an agreement and that Magic Leap should have honored it. Exhibit D at 90:8–9.

### F.     Magic Leap's Litigation Defenses

42.     In this litigation, Magic Leap relies on Johnson's assertion as its primary defense, with its corporate designee, Steven McCree Lake, testifying that all retention bonuses require a "signed and countersigned" formal agreement and Victoria Stewart stating they required a "DocuSign to be executed". Exhibit E at 66:13, 211:4; Exhibit B at 26:13-14.

43.     When asked to produce all documents reflecting any policy, practice, or requirement for board or committee approval of milestone-based bonus agreements, Magic Leap produced only Amendment No. 7 to the Note Purchase Agreement and did not produce any signed retention agreement for Plaintiff, any DocuSign document, or any written policy requiring execution of a formal document before a retention plan becomes binding. **Exhibit J: Defendant's Responses to Plaintiff's First Set of Requests for Production of Documents**, Resp Nos. 7, 14, 21.

44.     Stewart testified that DocuSign documents were generated "once all the approvals are in place." Exhibit B at 27:3-4.

45.     On November 30, 2022, Stewart emailed Baltazar reporting she had obtained approval from Magic Leap's CEO and CFO for a retention plan for another employee named John Monos and was "working . . . on getting the information in SF and subsequently a document for Monos to sign" within two hours of receiving that approval. Exhibit F at DEF_000089-90; Exhibit C at 38:21–39:22; 45:14-16; Exhibit B at 38:9–39:4.

46.     At the time Stewart began generating Monos's DocuSign, shareholder approval had not been obtained, and Monos had not reviewed the proposal. Exhibit C at 46:1-3; 52:15-16.

47.     Monos did not accept the retention proposal and left the company. Exhibit C at 52:20-22.

48.     Magic Leap asserts a second, alternative justification for non-payment: that it was prohibited from paying the bonus because approval of the noteholders was required under Amendment No. 7 to the Note Purchase Agreement. Exhibit I, Resp. Nos. 10, 12, 27, 30, 31, 33, 34.

49.     Amendment No. 7 to the Note Purchase Agreement is dated February 1, 2023, nearly seven weeks after the December 16, 2022 email exchange. Exhibit G at DEF_000265-266; Exhibit E at 163:5-164:4.

50.     Magic Leap's corporate designee, Steven McCree Lake, conceded that Amendment No. 7 "didn't exist at the time that offer was—or that discussion existed." McCree Exhibit E at 164:2-5.

51.     Section 8.10 of Amendment No. 7 restricts the use of "Seventh Issuance Note" proceeds for employee bonuses but does not purport to extinguish existing contractual obligations or prohibit Magic Leap from paying bonuses from other funding sources. Exhibit G at DEF_000266.

52.     McCree Lake confirmed that the December 16, 2022 email chain contained no language indicating the offer was "conditional." Exhibit E at 30:6-31:2.

53.     McCree Lake confirmed that the email contained no language indicating the bonus was "discretionary", nor did it mention of Amendment No. 7 or "noteholder approval". Exhibit E at 30:14-20.

54. Larson-Green, Plaintiff's direct supervisor and the person responsible for the milestones, stated that she and Plaintiff "were both unaware that his retention was conditional on some future retention process." Exhibit F at DEF_000153.

55. No one at Magic Leap—not Stewart, not Baltazar, not Bernal—ever communicated to Plaintiff that his retention bonus was discretionary, subject to additional approvals or requirements beyond milestone completion, or required any additional Docusign. Exhibit A, ¶¶ 10-11; Exhibit E at 30:6-31:2; Exhibit B at 107:7-8; Exhibit D at 34:17-22.

56. In its interrogatory responses, Magic Leap asserts that "Plaintiff was aware" of the noteholder approval requirement but identifies no communication, written or oral, in which that requirement was disclosed to Plaintiff. Exhibit H, Resp. No. 5.

57. Magic Leap has never maintained a written policy informing employees that retention plans are subject to noteholder or any other external approval. Exhibit E at 38:17-19; Exhibit C at 28:17-29:2.

58. When asked whether employees were informed about the noteholder approval requirement, Bernal stated, "I don't think we typically advertised that" as "nothing should be offered to an employee without going through that process." Exhibit D at 34:19-20; 30:17-21.

59. McCree Lake testified that the Compensation Committee retains ultimate discretion over retention payouts. Exhibit E at 99:4-7.

60. Magic Leap confirmed that before Q4 2022, Magic Leap's compensation procedures were non-uniform and there was no compensation committee. Exhibit E at 220:4-11; Exhibit C at 28:8-11.

61. Stewart testified that the annual performance bonus is "completely separate" from a retention plan; that a retention plan is "a direct agreement between the individual and the

company that says you must achieve X, Y, Z in order to receive this payment. It's an executed agreement that binds it." Exhibit B at 147:1-148:18.

62.     McCree Lake agreed with Stewart, stating that the annual bonus and retention plan "are distinct", and that the annual bonus is "discretionary," while a retention plan involves "a specific agreement, details related to how it's going to be assessed, other types of conditions." Exhibit E at 90:16-91:5; 94:11-13.

63.     McCree Lake conceded that if Plaintiff had completed the formalized milestone process, his acknowledged completion of the milestone would have been a trigger for the $100,000 payment. Exhibit E at 97:15-98:3.

64.     Magic Leap characterized the milestones as "loose", but acknowledged that the milestones had been defined. Exhibit E 203:20-204:2.

Respectfully submitted,

/s/ Jeremy C. Huang
Jeremy C. Huang, DC Bar No. 1000849
ROWE WEINSTEIN & SOHN, PLLC
909 Rose Avenue, Suite 640
N. Bethesda, MD 20852
(T) 301-770-4710 / (F) 301-770-4711
jhuang@rowepllc.com
*Attorney for Plaintiff David Chu*