# Exhibit B

Deposition of Victoria Stewart (Excerpts), January 23, 2026



# Transcript of Victoria Stewart

**Date:** January 23, 2026
**Case:** Chu -v- Magic Leap, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
DAVID CHU,                      )
                                )
                Plaintiff,      )
                                )
        v.                      )   Case No.:
                                )   1:25-CV-00574-RCL
MAGIC LEAP, INC.,               )
                                )
                Defendant.      )
_____)

Videotaped Deposition of VICTORIA STEWART

Conducted Virtually

Friday, January 23, 2026

10:31 a.m.

Job No:   613574

Pages:  1-155

Reported by:  Tracy Obering, RPR/CCSR

responsible for confirming that the employee

actually achieved the milestone stated.

Q. Okay. Perfect. And so after this email

chain do you know what happened next?

A. I don't recall specifically every next

step. I know I can speak to what would typically

happen, which would be we would work through kind

of a preliminary proposal of what a retention plan

would look like. We would ensure we have very

specific milestones with dates requiring for

achievement. And we would have gotten final

approvals. And based on those final approvals we

would have created a Docusign to be executed for a

record for both payroll and for total rewards.

Q. So let me ask you this. So for these

proposals would they be -- have been submitted to

the employee prior to receiving all final

approvals?

A. I'm not sure I understand your question.

Q. So you mention you had to get all these

approvals; correct, before --

A. Uh-huh.

Transcript of Victoria Stewart
Conducted on January 23, 2026                    27

Q.   And are these approvals -- once you obtain the approvals, what happens next?

A.   Once all the approvals are in place there is a Docusign.  There's an agreement that is created and executed via Docusign by our legal team.  And then that is entered into the employee's, basically, the record.

I guess I could equate it a little bit to your initial offer letter.  Right?  An offer letter is an executed document that states how much we're going to hire you in terms of pay, bonus target, et cetera.  That is an executed document that gets signed by both parties that becomes the legal document that we then abide by.

So a retention agreement is the same. It requires an executed Docusign that has -- outlines the specifics of the retention plan and that is then tracked based on those expected deliverables and then paid accordingly based on the outcome.

Q.   Okay.  But the question I want to drill down on was from this September email, there is

11:03:48
11:03:51
11:03:54
11:03:57
11:04:01
11:04:06
11:04:09
11:04:16
11:04:19
11:04:21
11:04:24
11:04:28
11:04:30
11:04:32
11:04:38
11:04:42
11:04:48
11:04:52
11:04:55
11:05:03
11:05:04
11:05:07

and John."  Peggy being Peggy Johnson?                    11:21:36

A.    That would be correct.                    11:21:41

Q.    Who is this John?  It's not John Monos                    11:21:42
that you are referring to?                    11:21:45

A.    It's not John Monos.  It would have                    11:21:48
been -- I believe it would have been finance.                    11:21:50

Q.    Do you remember John's last name from                    11:21:53
finance?                    11:21:56

A.    I do not.                    11:21:59

Q.    Okay.  So it says afterwards, "Am I                    11:22:00
good" -- you are asking Jose, "Am I good to                    11:22:03
proceed with entering it in SF?"                    11:22:06

What is SF?                    11:22:07

A.    SuccessFactors, which is our HR tracking                    11:22:09
system.                    11:22:13

Q.    And then you are asking him, am I good                    11:22:13
to enter it in that program and then getting a                    11:22:15
communication document for James T to share with                    11:22:18
Mr. Monos.                    11:22:22

Who was James T?                    11:22:22

A.    James T would have been James Templeton,                    11:22:24
I believe.  He was another senior leader in a                    11:22:29

Transcript of Victoria Stewart
Conducted on January 23, 2026                39

different part of the business.                              11:22:34

Q.    Would that be Mr. Monos -- the person he              11:22:36

reported to?                                                11:22:39

A.    I am assuming so, yes.                                11:22:40

Q.    Okay.  And here you asked, "Are there                11:22:42

any other approvals required?"  Do you see that in         11:22:44

the email?                                                 11:22:47

A.    Yes.                                                  11:22:48

Q.    And you also asked, "I'm just checking               11:22:48

because I want to make sure I'm following the              11:22:50

proper process."  Is that correct?                         11:22:52

A.    That is correct.                                      11:22:54

Q.    Okay.  So by this point you had been                 11:22:54

with the company about eight months?  Would that           11:22:57

be correct?                                                11:23:00

A.    That's correct.                                       11:23:01

Q.    Okay.  Why was there still uncertainty               11:23:02

as to whether the process was being followed               11:23:07

correctly?                                                 11:23:11

A.    I most likely -- I mean, I can't speak               11:23:18

to exactly why at this point, Jeremy, three years          11:23:22

later, but -- four years later.  But I am going to         11:23:26

again --

Q.    Sorry.

A.    -- I don't recall when I started working
on Monos' retention plan, the timing of that and,
you know, if -- I don't know how to explain it.
The situation with David Chu was something that
was starting -- we had started discussing.  But I
can't recall the specifics with John Monos versus,
you know, what would be different for David Chu.

Q.    Let's just look at the timelines.

You agree that Peggy approved whatever
framework, however you want to say it, approved
something for David back in October of 2022;
correct?

A.    Peggy approved the concept of moving
forward with a retention plan for David.

Q.    Okay.  Concept, in that email there is a
chart with a breakdown of specific amounts of
money for certain --

A.    Correct.

Q.    -- time periods; correct?

So that -- you consider that a concept?

11:46:14
11:46:15
11:46:15
11:46:17
11:46:31
11:46:39
11:46:44
11:46:49
11:46:53
11:46:57
11:46:58
11:47:01
11:47:04
11:47:06
11:47:10
11:47:12
11:47:15
11:47:20
11:47:24
11:47:25
11:47:26
11:47:27

Right?

A.    We had agreed to the 600k.  But what you left out is to which she needed to assign specific milestones.

Q.    Okay.  You see on the email below from Julie starting -- the header starts at the bottom of that page and then proceeding to the next page.  Let me know when you've had a chance to pull it up.

A.    But those are repeats of what we just reviewed.

Q.    No.

A.    Yes, they are.

Q.    On the bottom of the page it says from Julie Green to you, Saturday, January 21st, 2023, which is -- shortly afterwards it says -- I don't know if you had a chance to scroll up.

A.    Sorry.  That was mixed in.

Q.    It is confusing.

A.    Where she says, "We agreed on the milestones a while back," the milestones were not specific.

THE VIDEOGRAPHER:  We are now back on the record.  The time is 12:40.

MR. HUANG:  I'd like to pull up Exhibit 9, please.

(Deposition Exhibit Number 9 was marked for identification)

BY MR. HUANG:

Q.   Could you just read the first page of that and let me know when you are done?

A.   Okay.

Q.   Okay.  So this is an email where Mr. Chu first inquires with you about the status of the payment; is that correct?

A.   It's an email where he's asking me, yes.

Q.   Had you received any prior communication from him about the retention payment?

A.   I don't recall.

Q.   Okay.  All right.  So your email was a week later; correct, on April 24th at 11:06 a.m.?

A.   Yes.

Q.   Okay.  You told him, "Your retention we had discussed was part of the broader retention

12:40:50
12:40:51
12:40:57
12:40:59
12:41:18
12:41:18
12:41:18
12:41:18
12:41:20
12:41:44
12:41:46
12:41:50
12:41:53
12:41:56
12:41:59
12:42:01
12:42:06
12:42:09
12:42:16
12:42:22
12:42:23
12:42:27

plan that has been placed on hold at this time"                    12:42:30

--is that correct?                    12:42:32

A.   Yes.  That's what's in this email.                    12:42:34

Q.   Okay.  -- "pending the outcome of the                    12:42:35

job architecture initiative that is underway."                    12:42:38

A.   Yes.                    12:42:41

Q.   Do you recall if you told him any of                    12:42:42

this previously?                    12:42:44

A.   I do not recall.                    12:42:46

Q.   Do you think it's likely that this is                    12:42:50

the first time that you told him?                    12:42:52

MS. BONAFEDE:  Objection.  Calls for                    12:42:56

speculation.                    12:42:59

BY MR. HUANG:                    12:43:00

Q.   Please answer the question.                    12:43:00

A.   I don't recall.  I would just -- as a                    12:43:04

senior leader for the organization, I understood                    12:43:10

some of the initiatives that were happening at                    12:43:13

that time, but I can't recall if he specifically                    12:43:17

understood the connection.                    12:43:19

Q.   What was the job architecture                    12:43:23

initiative?                    12:43:32

A.   Again, I can't speak to when he became aware.

Q.   I'm asking whether he was on any of those emails on the prior discussions.

A.   The emails that you shared with me here?

Q.   Correct.

A.   Where I specifically addressed it with Julie or with Shirley, he was not copied.

MR. HUANG:  Okay.  Could we pull up Exhibit 12?

(Deposition Exhibit Number 12 was marked for identification)

BY MR. HUANG:

Q.   All right.  Please read the email from Julie to Sheri from April 25th at 12:22 a.m.  And let me know when you are finished completing reading it.

A.   Okay.

Q.   Okay.  So you see here in this email Ms. Green wrote, "Revisiting his retention as part of the new retention plan doesn't seem right given that he received paperwork on what to expect over

13:09:17
13:09:21
13:09:21
13:09:23
13:09:26
13:09:28
13:09:29
13:09:35
13:09:47
13:09:49
13:10:30
13:10:30
13:10:31
13:10:31
13:10:33
13:10:39
13:10:42
13:12:56
13:12:57
13:13:03
13:13:06
13:13:09

Yes or no, did Julie have the authority 13:35:09
to set what the milestones were? 13:35:10

A.   I'm going to say, yes. 13:35:19

Q.   Okay. 13:35:22

A.   But I'm going to have the opportunity to 13:35:22
clarify.  As I stated multiple times this morning, 13:35:25
she had the authority to set the milestones with 13:35:30
what deliverables, which included what had to be 13:35:33
done by when.  Even she in her email earlier that 13:35:37
you shared with me, did not have a way -- had not 13:35:41
stated a way that she was going to track the 13:35:46
deliverables.  And that is one of the things that 13:35:49
has to be clear on what has to be done by when in 13:35:53
order to receive X, Y, Z payment. 13:35:58

She didn't have those deliverables 13:36:03
nailed down in that way.  She have might have had 13:36:06
it in her head, but we never documented the exact 13:36:09
deliverables for David, nor again, was it formally 13:36:14
approved until it got approved all the way through 13:36:21
funding for us to proceed with creating the 13:36:24
document for David and Magic Leap to execute for 13:36:28
that retention plan. 13:36:34

that you can hit, then you can achieve more dollars. But that is part of a documented compensation plan that is executed by both parties.

Q. Okay. The question -- the reason I asked that is because you said your contention was that David should have produced these milestones as the normal course of his job.

That was your contention; correct?

A. Well, my intention was that these things are things David would have been working on. Now whether or not we would have done it sooner through a retention plan, yes, you know, I mean, but then again, that's why I'm saying his compensation changed. When we put in retention plans that's a change in your compensation plan. Therefore, it requires an updated, you know, that retention agreement to state you are going to do these sooner and we are going to, you know, pay you this additional money on top of your normal compensation. But it requires the executed agreement for that to be binding.

retention plan is completely separate from those

things.  And ultimately if you get an approved

retention plan in place, then that's additional

compensation that you earn on top.

Q.   Okay.  So would it be fair to say for

annual bonuses, it's kind of -- it's somewhat

outside of your control because it depends on the

company performance.  Would that be accurate?

A.   Correct.  I mean, there is, you know,

the funding of the bonus pool in the aggregate is

completely based on the company's performance and

how much they fund.

I would say as an individual performer

you have some control.  Because how well do you do

your job?  How well do you execute on the

expectations of your role?  And so that's where

you could influence the outcome.

But at the end of the day, if the

company said, hey, we are in the tank, you know,

we don't have funding for the bonus share, you

wouldn't get anything.

Q.   Okay.  So it's different for the

retention.  The retention, like I said, assume the

signed agreement, whatever else, if you hit the

target, that's in your control, you get paid what

was agreed upon; correct?

A.   Yes.  The difference between the annual

bonus plan and a stated retention plan is the

retention plan specifically states what has to be

done by when in order to earn X, Y, Z bonus

amount.  And that's a legal binding document.

Whereas, the annual bonus plan clearly articulates

that funding is contingent upon the company

performance and, you know, individual performance.

And there is no guarantee that that would be paid.

A retention plan is a direct agreement

between the individual and the company that says

you must achieve X, Y, Z in order to receive this

payment.  It's an executed agreement that binds

it.

Q.   And so for these agreements -- like I

said, I don't have many questions left, so it must

be a relief.

So you and total rewards and Jose or

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Tracy Obering, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 28th day of January, 2026.

My commission expires:

December 31, 2028

_____

NOTARY PUBLIC IN AND FOR

THE STATE OF MARYLAND