# Exhibit C

Deposition of Jose Baltazar (Excerpts), February 11, 2026



# Transcript of Jose Baltazar

**Date:** February 11, 2026
**Case:** Chu -v- Magic Leap, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
DAVID CHU,                    )
                              )
            Plaintiff,        )
                              )
        v.                    )    Case No.:
                              )    1:25-CV-00574-RCL
MAGIC LEAP, INC.,             )
                              )
            Defendant.        )
_____)


Videotaped Deposition of JOSE BALTAZAR

Conducted Virtually

Wednesday, February 11, 2026

9:16 a.m.


Job No:   615999

Pages:   1-118

Reported by:   Tracy Obering, RPR/CCSR

Q.   Yes, sir.                                          09:45:02

A.   I don't remember.  I think towards the             09:45:10
end when I was leaving, yes.  I don't recall.  I        09:45:11
don't want to say something that is not in there.       09:45:15
Because when I left, things were changing.              09:45:17

Q.   Okay.                                              09:45:20

A.   I don't recall.                                    09:45:21

Q.   But you would agree that, at least for             09:45:22
part of your tenure, there was no compensation          09:45:26
committee?                                              09:45:29

A.   Yes.  The process was as I described.              09:45:29

Q.   Were you -- by the time there was a                09:45:34
compensation committee were you still in charge of      09:45:40
handling the employee compensation changes?             09:45:42

A.   Like, I don't recall.  Like, that part             09:45:45
when I was leaving, I really don't recall.              09:45:47

Q.   Okay.  Do you recall if there was any              09:45:52
written policies regarding the process you just         09:46:09
described?                                              09:46:13

A.   I don't recall.  You mean if it was                09:46:15
written, everything that I described?                   09:46:20

Q.   Yes, sir.                                          09:46:21

Transcript of Jose Baltazar
Conducted on February 11, 2026                29

A.    I don't recall.  You have to ask the company for the records.  I don't recall.

MR. HUANG:  All right.  I want to pull up Exhibit 2.

THE VIDEO TECHNICIAN:  One moment.

(Deposition Exhibit Number 2

was marked for identification)

BY MR. HUANG:

Q.    All right.  Mr. Baltazar, I'm going to give you an opportunity to read through this email chain.

Could you give him control so he can scroll through himself?  When you finish it, please let me know.

THE VIDEO TECHNICIAN:  Hold on.  Let me get back to the actual -- there you go.  He should have ability to take control now, sir.

THE WITNESS:  Okay, let me try.  Okay.

BY MR. HUANG:

Q.    Perfect.  Sir, do you recognize this document -- these emails?

A.    I recall portions of it.

09:46:23
09:46:25
09:46:42
09:46:43
09:46:55
09:47:15
09:47:15
09:47:16
09:47:16
09:47:19
09:47:21
09:47:21
09:47:24
09:47:28
09:47:34
09:47:35
09:47:36
09:47:41
09:50:08
09:50:08
09:50:11
09:50:13

Transcript of Jose Baltazar
Conducted on February 11, 2026                    30

Q.   This is, as you described, you -- the manager had talked to you and this is where you obtained CEO approval of a proposal for Mr. Chu; is that correct?

A.   By "approval" you mean if it's final or do you mean approval is to proceed to the next step.

Q.   To the next step as you described.  Your prior testimony is there was an initial pass to the CEO; is that correct?

A.   That's what I recall.

Q.   Okay.  And could you -- sorry.  Could you tell me what happens next, I guess, in an ideal practice of getting it approved?

A.   As I recall, there is a couple of things.  What should happen is normally take this and then go to the shareholders, make sure that they are aligned.  And if they agree, then I will come back and then get it, you know, get it signed.

What would happen, sometimes what we would do is have a conversation with the employee

09:50:15
09:50:17
09:50:23
09:50:27
09:50:31
09:50:33
09:50:35
09:50:37
09:50:39
09:50:42
09:50:44
09:50:45
09:50:50
09:50:53
09:51:00
09:51:01
09:51:04
09:51:09
09:51:17
09:51:22
09:51:24
09:51:25

Transcript of Jose Baltazar
Conducted on February 11, 2026                    38

David.  That's what the message is implying.                    10:05:31

Q.   So that would have been after getting                    10:05:36
approval from the shareholders?                    10:05:38

A.   That's what I don't recall, if it was                    10:05:40
just before.  That's why I wanted to see the file.                    10:05:43

Q.   Okay.                    10:05:46

A.   I remember this process with the number.                    10:05:46
What I recall is we had to go back and forth.                    10:05:49

Q.   Okay.  All right.  So let's go back to                    10:05:56
page 4.  There is an email from Vicky Stewart to                    10:05:59
you dated November 30th, 2022 at 1:52.                    10:06:04

A.   Page 4, just tell me when I am --                    10:06:11

Q.   Yes.  That's where you go.  Right there.                    10:06:18
Right where the cursor is, right below it.  "Vicky                    10:06:21
Stewart.  I have the approval."                    10:06:23

Read that email and let me know when you                    10:06:27
are done.                    10:06:29

A.   "I have the approval" -- you mean for                    10:06:30
John Monos?                    10:06:33

Q.   Yes, sir.                    10:06:33

A.   Okay.  "I have the approval for John                    10:06:35
Monos' retention."                    10:06:37

Transcript of Jose Baltazar
Conducted on February 11, 2026            39

You want me to read it; right?                    10:06:38

Q. To yourself, please and just let me know        10:06:40

when you are done. Yes.                            10:06:41

A. Yes.                                            10:06:57

Q. Okay. And then your response to her            10:06:57

was -- could you read your response to her?        10:07:00

A. Yes.                                            10:07:05

Q. Okay. So who is -- who are the Peggy           10:07:05

and John referred to in Victoria's email?          10:07:08

A. Peggy is the CEO. John is the CFO.             10:07:13

Q. And who is the James T. referred to in         10:07:15

this document?                                     10:07:19

A. He's the manager of John Monos.                10:07:20

Q. Okay. So Peggy -- here Victoria Stewart        10:07:22

asked you if she needed any additional approval     10:07:28

beyond the approvals from the CEO and CFO;         10:07:31

correct?                                           10:07:34

A. Correct.                                        10:07:35

Q. Okay. And she asked if she can go ahead        10:07:35

and send all the documents to the manager to share  10:07:40

with the employee; is that correct?                10:07:42

A. That's correct, yes.                           10:07:50

Transcript of Jose Baltazar
Conducted on February 11, 2026                    46

A.    But it still has to be routed.  James has to have the conversation like on the previous email that you just saw.

Q.    I understand.  But she was already generating a document for the employee signature; correct, at this juncture?

A.    Yes.  We prepare everything ready.  But as I mentioned on this scenario, the employee left.

Q.    So as you may or may not know, I spoke to Victoria a couple weeks back.  Her testimony was that the shareholders had to approve everything before a document was signed.  Is that inaccurate?

A.    That's what I said.  Right?  Isn't that what I mentioned that --

Q.    No.  I'll let you finish.  I am sorry.

A.    No.  Go ahead.

Q.    Okay.  So Victoria Stewart's testimony was that there needed final shareholder approval before a Docusign would be produced for the employee to sign.

10:25:10
10:25:13
10:25:17
10:25:19
10:25:21
10:25:23
10:25:24
10:25:26
10:25:32
10:25:33
10:25:35
10:25:38
10:25:42
10:25:44
10:25:46
10:25:49
10:25:50
10:25:52
10:25:54
10:25:55
10:25:59
10:26:02

getting information in sales force --     10:30:06

SuccessFactors, subsequently a document for Monos     10:30:06

to sign."     10:30:10

Q.   Okay.  So based on this email, your     10:30:11

understanding, does it make sense that -- does it     10:30:14

appear to you that the manager had had the     10:30:17

conversation with the employee about the terms of     10:30:19

the proposal?     10:30:21

A.   He's going to have the conversation with     10:30:23

him.     10:30:25

Q.   Okay.     10:30:25

A.   That's what's written here.     10:30:26

Q.   So logically, Mr. Monos is not aware of     10:30:27

the proposal at this juncture?     10:30:30

A.   He has not reviewed.  That's what is     10:30:31

written here.  Right.     10:30:34

Q.   All right.  So --     10:30:36

A.   But -- go ahead.  No, no.  Go ahead.     10:30:37

Q.   So your testimony also was that     10:30:39

ultimately, Mr. Monos did not accept the proposal     10:30:40

and left the company; is that correct?     10:30:43

A.   Yes, that's correct.     10:30:47

from Victoria, December 16th at 7:19 p.m., "Based on the chat from Jose, this is what I plan to share with David on his retention plan."

          Do you see that?

     A.   Yes.

     Q.   Okay.  So this had not been shared with David as of this particular email; correct?

     A.   That's what I'm reading here.  That's my understanding.

     Q.   All right.  So I said, based on your recollection, have these numbers been -- had this particular plan been approved by Ms. Johnson at this juncture before sending it to Mr. Chu?

     A.   I don't remember to be -- that's what I was saying, what I remember is there's an initial proposal.  David negotiated and didn't agree, so we had to go back and redo the numbers, which is what all the correspondence mentioned.

          Now you are asking me on that December 16, 2022 had I already gone back and chatted?  I don't recall.  I would have to go back and look at records.  My memory is not that good.  Apologies.

10:39:35
10:39:38
10:39:41
10:39:44
10:39:44
10:39:44
10:39:47
10:39:52
10:39:54
10:39:54
10:39:58
10:40:01
10:40:05
10:40:08
10:40:12
10:40:15
10:40:17
10:40:21
10:40:22
10:40:23
10:40:28
10:40:29

Transcript of Jose Baltazar
Conducted on February 11, 2026          60

Q. I understand. So -- but let's say in an ideal -- in your ideal process, once the figures had been agreed to by the employee, would you have had to go back to the CEO for approval?

A. So it follows the process. Right. I'm just trying -- I'm not trying to not answer your question. It's like what I mentioned and you can see on the emails. Put a proposal together, discuss with the manager, get approval from Peggy, talk with the shareholders, present to the employee.

If David Chu had said yes with the numbers that I had on that chart on 400, you would have exactly what you had seen with Monos, is that document uploaded to SuccessFactors that he would have signed. You can see from October all the way to December, since the numbers change is because he was negotiating. So then I have to go back and get all of the other approval again, if that makes sense.

Q. Okay.

A. I don't know if that makes sense.

10:40:34
10:40:38
10:40:43
10:40:46
10:40:55
10:40:58
10:41:01
10:41:02
10:41:05
10:41:07
10:41:09
10:41:09
10:41:12
10:41:16
10:41:18
10:41:22
10:41:25
10:41:28
10:41:30
10:41:34
10:41:35
10:41:35

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

        I, Tracy Obering, the officer before                    12:04:22

whom the foregoing deposition was taken, do                    12:04:22

hereby certify that the foregoing transcript                    12:04:22
is a true and correct record of the testimony                    12:04:22
given; that said testimony was taken by me                    12:04:22
stenographically and thereafter reduced to                    12:04:22
typewriting under my direction; that reading                    12:04:22

and signing was requested; and that I am                    12:04:22

neither counsel for, related to, nor employed                    12:04:22

by any of the parties to this case and have                    12:04:22

no interest, financial or otherwise, in its                    12:04:22

outcome.                    12:04:22

        IN WITNESS WHEREOF, I have hereunto set                    12:04:22

my hand and affixed my notarial seal this                    12:04:22

21st day of February, 2026.                    12:04:22

        My commission expires:                    12:04:22

        December 31, 2028                    12:04:22

                    12:04:22

_____                    12:04:22

NOTARY PUBLIC IN AND FOR                    12:04:22

THE STATE OF MARYLAND                    12:04:22