# Exhibit E

Deposition of Steven McCree Lake (Excerpts), January 21, 2026



# Transcript of Steven McCree Lake, Corporate Designee

**Date:** January 21, 2026
**Case:** Chu -v- Magic Leap, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

DAVID CHU,                )

        Plaintiff,    )

        Vs.           )   Case No. 1:25-cv-00574-RCL

MAGIC LEAP, INC.      )

        Defendant.    )

VIDEO RECORDED DEPOSITION

TESTIMONY OF STEVEN MCCREE LAKE

January 21, 2025, 9:35 a.m.

Job No. 617278

Pages: 1-230

Transcribed by: Cynthia Bauerle, CSR

Notary Public/Court Reporter: Jaime Breeden,

AAERT CER

So there would be -- there would definitely be more discussion internally, and then alignment with counsel, and ultimately a signed agreement with -- with both parties countersigning.

Q.    Okay.  But just looking at this email chain, is there any language indicating that this proposal was conditional or there's anything that required additional approvals of any sort?

A.    No.

Q.    Okay.  Does this email contain any language required saying that this retention was discretionary?

A.    Can you scroll down one more time?  No, it does not.

Q.    Okay.  And does this email mention, I guess, Amendment Seven or anything regarding no holder -- noteholder approval?

A.    It does not.

Q.    Okay.  Does it mention any -- any sort of approval, like, a subsequent

approval being needed?

A.    It doesn't.

Q.    Okay.  So going back to the email after the proposal from Ms. Stewart to Mr. Chu, what was Mr. Chu's response?

A.    Can you scroll down, please?  He shows appreciation and suggests that he would like to move forward.

Q.    Okay.  So would it be Miss -- I guess, Magic Leap and Victoria Stewart's understanding that let's do it would mean his acceptance of the proposal?

MS. HEISCHMIDT:  Object to form.

THE WITNESS:  Okay.  Can you rephrase that?  I'm not quite sure I understand.

BY MR. HUANG:

Q.    Okay.  So how did Vic- -- Ms. Stewart understand Mr. Chu's response?

A.    While I can't speak to her mindset, in general, what this appears to be, to me, is an affirmative response to move

of the organization.  So for every other bonus that's related to retention or a milestone payment, any kind of special compensation structure like this one, every other one that we have has been memorialized in a, you know, enforceable agreement document.  Either, like I mentioned before, an amendment to someone's employment agreement or some other specialized agreement in which all of the terms and conditions are specified.

There are typically, you know, details associated with any milestones, conditions of employment, clawback provisions.  All parties are aligned.  And then there's a signature by the employee and a counter signature by an officer of the company.

Q.    Okay.  So is that a written policy or procedure?

A.    It's the prevailing practice of the organization.

Q.    Okay.  And who trained you on that particular or who taught you about the

would relate to our AR devices, but difficult to say more than that.

Q.    Okay.  So I guess the question would be, the proposal from Vicky back in December 16th was that there were milestones to be set by the CTO, Julie Green.  Would that be correct?

A.    That's right.

Q.    So and Ms. Green would be responsible for determining whether Mr. Chu had met these milestones.  Wouldn't that also be correct?

A.    Yes, that's correct if that's what ultimately folks agreed on.

Q.    Okay.  All right.  And so is there any contention that Mr. Chu delivered on this particular milestone?

A.    I recall an email thread when Mr. Chu resurfaced what he believed to be his eligibility for the payment on the proposed but unapproved retention and milestone plan. I -- I remember that Julie responded, saying

with -- with employment counsel.  Is that -- wasn't that your prior testimony?

A.    It was.

Q.    Okay.  And how did Ms. Green not know this?

A.    I can't speak to how Ms. Green didn't know this.  She certainly should have been aware as a senior leader at the company that there would have been more steps.  To give you an example, if there were other people and there were -- receiving some sort of retention or milestone bonus, they all would have had signed and countersigned agreements in place.  Ms. Green would have known that.

Q.    And have you had the chance to review all of these Docusign documents for other -- other arrangements with other employees?

A.    Magic Leap has had thousands of employees and paid thousands of bonuses. However, I have spot checked a few of them to

this context, it's -- this table is a bit confusing. However, the -- the different bonuses, just to keep myself on track, the different bonuses being described here are the original sign-on, a deferred sign-on retention grant, a part of the original agreement, and then a proposed retention/milestone plan, that to your point, was being discussed.

That would have been -- would it have been sort of memorialized and approved. That would of been subject to all the things that we've discussed as specific -- a specific agreement, details related to how it's going to be assessed, other types of conditions, and information in that agreement.

The annual bonus is distinct. The conditions by which are -- it's specified are in the original employment agreement. And typically, an employee is given a target, which is a percentage of their base salary that corresponds with their role and level and is part of participating in our annual

performance review cycle each year.  And --
and to your earlier questions, it's based on
the company funding, individual performance,
and other factors.

So, yes, they are distinct.

Q.    Okay.  Appreciate that.  And --
and you've noticed here that the item, the pay
component, refers to an annual bonus, and
there's no -- bonus is not, like, at least not
used with the retention in terms of describing
the pay component.  Would that be accurate?

A.    Yeah.  It's accurate as to
what's on the table.  Sure.

Q.    Okay.  All right.  I'd like to
pull up Exhibit 7.

(Exhibit 7, March 22, 2023 David
Chu Email, marked for identification.)

THE TECH:  Now, displaying
Exhibit 7.
BY MR. HUANG:

Q.    All right.  Sir, could you
please read through this and let me know when

When it comes down to, like, retention bonuses and milestone bonuses, those -- when they get memorialized through an agreement, they're accrued for from a financial and a payroll perspective, in the same way as the -- the annual bonus would be based on our best estimate of when it would be paid and how much.

Q.    Okay.  But let me ask you this. So let's -- in a hypothetical, had this -- you mentioned that the annual bonus is discretionary, correct?

A.    Right.

Q.    And the retention plans, had they been approved, are not discretionary. Would you agree with that?

A.    The way that I would characterize that --

Q.    Let me -- let me re- -- I'm sorry.  Let me rephrase that.

So let's -- let's just say, for the sake of argument, the board of whatever

plans of some of the milestones, in particular, of some level of evaluation and discretion on the part of some governance group, either the -- an officer of the company, multiple officers, the compensation committee, et cetera.  We generally don't have sort of unilateral approval on these types of milestone bonus plans.

Q.    Okay.  So let me ask the question more simply.  Let's just assume, like I said, just for the sake of this question, everything's -- all the T's are crossed, I's are dotted.  The plan's good.

A.    Uh-huh.

Q.    Mr. Chu hits these milestones.

A.    Uh-huh.

Q.    He would get the $100,000 for the quarter if he achieved the milestones that -- like I said, assuming everything that was in place.  He would be offered the -- he would get the 100,000, not a different amount.  Would that -- would that be accurate?

A.    Yeah.  Had everything been in -- okay.  Had everything been in place as I described earlier, yes, he would have.

Q.    Okay.  So it would not be in the board or whoever's discretion to say, you know what, I'm cutting it to 70,000.  There would -- there would be no way to -- to -- there no -- be able to have any unilateral discretion to reduce the amount that he would be owed?

A.    Typically, to -- again, just to be transparent and clear about our practices, yes, they could do that.  Typically, when we -- and this is why we formalize these agreements, is this exact kind of discussion.

While obviously, you know, the agreements are structured and signed off in -- in good faith, we put all -- a lot of detail and work behind them when we put these in place with the executives to make sure that it's quite clear that, yes, if you deliver these things in good faith and meet the

expectations, we're going to evaluate you as fairly as possible.  But generally, there's always a condition that the -- it -- during the evaluation or the compensation committee will have ultimate approval, authority, and -- and discretion about, you know, what percentage of the bonus is paid.

That said, it generally is contingent upon how the agreement is structured.  We -- we structure these things in a lot of ways.  It's why I keep referencing that, the memorialization aspect, because of all these types of questions.  We generally align very carefully with the executive to be clear about what happens if the deadline is missed.  Is it an immediate cliff and there's no payment?  Is there opportunity for a lesser amount?  How we're going to assess these?  Is there a rubric?  Is there --

Just to your question about, in some cases, it is discretion between the management team and the compensation committee.  There's

Q.     Okay.  All right.  And this amendment is -- when was it -- what is it dated?

A.     Can you scroll up, please?  It appears to be dated 7th of February 2023.

Q.     Are you sure?

A.     It's written in blue, yes.

Q.     Okay.  Are you sure?

A.     Oh, sorry.  Seventh of February 2023.  Am I mis- -- if -- unless I'm misreading something.

Q.     I -- I'm reading it as February 1st, 2023.  Am I -- am I reading it wrong?

A.     Oh, amendment.  No, I apologize. Seventh.  Amendment Number Seven, February 1st, 2023.  Thank you.

Q.     All right.  Perfect.  I just want to make sure we're on the same page on this one.  So February 1st, 2023, this was after -- chronologically after the December 16th email exchange between Vicky Stewart and Mr. Chu and -- and everyone else involved?

A.    Correct.

Q.    Okay.  So this amendment didn't exist at the time that offer was -- or that discussion existed, correct?

A.    It -- it did not.

Q.    Okay.  That the same -- that first January 21st email from Vicky Stewart to all the HR heads discussing the agreed arrangements, that existed before this, this amendment, correct?

A.    The conversation happened before the amendment was in place, yes.

Q.    Correct.  Okay.  All right.  So you would agree that at the time that Dav- -- Mr. Chu thought he was entering into the agreement, that there was no way that he could have known about this amendment?

A.    There's no -- there's no written record that he knew about it, but he may -- I mean, he may have known about it given the ongoing discussions at the time.  I can't say.

Q.    Okay.  But in the -- in the

There are other things that intelligent people choose to do at the end of the day that may not always, you know, be the way that you would expect.  So, yes, you're right there -- intelligent people might choose to do the work and just get paid.  Intelligent people also know -- intelligent people who work at Magic Leap know you have to get these things formalized in order to get paid for a special bonus for your work, as everyone else, including Mr. Chu for his original agreement and including people on Mr. Chu's team who were getting retention bonuses, all had.

Q.    So your characterization is that Mr. Chu relied on hopes and prayers to get the 100,000?

MS. HEISCHMIDT:  Objection. Form.

THE WITNESS:  My -- my contention is just that Mr. Chu never got a formalized agreement in place for whatever reason and, therefore, did not have a

structure in which to get paid for these specific loose milestones that were defined.

BY MR. HUANG:

Q.    Is your contention that there was nothing Magic Leap could of done for David to get this -- get him paid for the -- for what he accomplished?

A.    At the time when this was raised, so in this -- this is like late Q3, he -- you meant -- we talked about. He -- he sent the email in April. So that would have been early Q2.

There was very little, if no, chance of getting that paid without having either A, had a -- having had a very structured agreement already in place prior to, per the note agreement, I believe it was December the 1st, that would have been needed to be in place, or B, being able to fundamentally get approval for, reframe a -- a structured proposal that was much more rigorous than what was put together.

A.    No.  It's a -- it's a -- an important question, so let me try to clarify.

So if -- if a person -- if an employee of Magic Leap has a signed and countersigned agreement through -- we use Docusign, then in that case, we -- we -- we're not not honoring our commitment to that employee in that agreement.  It goes -- it goes through, you know, a process from an HR perspective, a payroll perspective, all the things.  It's accrued for, it's accounted for.  And if, based on the conditions of the signed agreement, if they are met, the payments are -- the bonus payments are made.

What I believe Julie is referring to here are scenarios where, in the thread I'm doing my best to interpret, and Magic Leap's position would be that she and Ibrahim are discussing compensation, people she's -- she's referring to maybe a few people who might have gotten competing offers at higher salaries.  And then there's some adjustment that's

to the comp committee or anyone on the board of directors?

A.    Definitely not.

Q.    You mentioned earlier that prior to this broader retention plan that occur- -- occurred in Q4 2022, I remember -- I recall you testifying that there was a much more individual approach or it was not -- not as uniform.  Is that -- did I recall that correctly?

A.    You do, yes.

Q.    Okay.  So would it be fair to say that David was kind of in the transition period of things that are happening?

A.    Every -- let me try to answer specifically to be clear.  So, during 2020 and 2021, and to some extent into 2022, to what I said earlier and what you're asking, there were various types of retention -- individual retention agreements that were put into place for specific leaders and executive.  Some of these people were on David's team.

CERTIFICATE OF TRANSCRIBER

I, Cynthia Bauerle, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

*Cynthia Bauerle*

_____

CYNTHIA BAUERLE, CSR

1/26/26

CERTIFICATE OF COURT REPORTER-NOTARY PUBLIC

I, Jaime Breeden, AAERT CER, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

_____

JAIME BREEDEN, AAERT CER,

NOTARY PUBLIC FOR THE STATE OF MARYLAND