**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DAVID CHU | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No. 1:25-cv-00574-RCL |
| vs. | * | |
| | * | |
| MAGIC LEAP, INC. | * | |
| | * | |
| Defendant. | * | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF**
**MATERIAL FACTS NOT IN DISPUTE**

In accordance with Federal Rule of Civil Procedure 56 and Local Rule 7(h)(1), Plaintiff David Chu respectfully submits the following response to Defendant Magic Leap, Inc.'s Statement of Material Facts Not in Dispute contained in its Memorandum in Support of its Motion for Summary Judgment (ECF No. 19, at 2-9).

### a. Chu's Employment Agreement with Magic Leap

1.     Chu's employment agreement states: "You will be eligible to participate in a bonus plan that the Board of Directors of the Company may adopt for employees of the Company." Ex. A at 2.

> **RESPONSE:** Undisputed that the employment agreement contains this quote. Disputed to the extent Defendant implies this provision governs the December 2022 Retention Plan as the sentence following the quote states "If such a plan is adopted, you may be eligible to earn an *annual bonus* of up to 35% of your then-current annual salary." (Ex. A to Defendant's Motion for Summary Judgment, at 2 (emphasis added).) Defendant's own witnesses confirmed that the annual performance bonus is "completely separate" and "distinct" from a retention plan. Pl. Ex. B, Stewart Dep. (ECF No. 20-3), at 147:1-148:18; Pl. Ex. E, McCree Lake Dep. (ECF No. 20-6), at 90:16-91:5; 94:11-13.

2.     Chu's employment agreement states: "The amount of any performance bonus to be paid to you is at the sole discretion of the Company, and you must be a full-time employee of the Company in good standing at the time any such performance bonus is to be paid to you." Ex. A at 2.

> **RESPONSE:** Undisputed that the employment agreement contains this language. Disputed to the extent Defendant implies this "sole discretion" provision applies to the December 2022 Retention Plan. This language follows the statement quoted in Plaintiff's

response to ¶ 1, identifying the annual bonus program (Def. Ex. A at 2). Defendant's own witnesses confirmed that the annual performance bonus is "completely separate" and "distinct" from a retention plan. Pl. Ex. B, Stewart Dep. at 147:1-148:18; Pl. Ex. E, McCree Lake Dep. at 90:16-91:5; 94:11-13.

3.      Chu's employment agreement states: "the Company reserves the right to modify compensation from time to time as it deems necessary." Ex. A at 1.

**RESPONSE:** Undisputed. On December 16, 2022, Stewart sent an email setting forth terms modifying Plaintiff's compensation to include a retention plan with quarterly payments over two years, which Plaintiff accepted in writing.

4.      Chu's first year compensation, including his first-year bonus structure, was memorialized into a written agreement, which was signed by Magic Leap and Chu. Ex. A; Ex. B. at 82:4-83:7.

**RESPONSE:** Undisputed.

5.      This agreement was the only compensation agreement that Chu received, which was memorialized into a written agreement and signed by Magic Leap and Chu. Ex. A.

**RESPONSE:** Disputed. The December 16, 2022 email exchange constituted a second compensation agreement. (ECF 1-6 at 1.)

### b. Magic Leap's Policies, Practices, and Procedure as to Compensation

6.      It was Magic Leap's policy, practice, and procedure to discuss a proposed compensation plan with the employee before seeking approval from the Board of Directors and signing an amendment to the employee's employment agreement. Ex. C, Victoria Stewart Depo. Tr., at 75:1-76:11, 65:20-67:3; Ex. D, Magic Leap Corp. Rep. (McCree Lake) Depo. Tr., at 21:6-22:20 ("Q. Okay. So what does the CEO's approval mean at that - what did the CEO's approval mean at that point regarding this proposal? A. Per our process, the approval would of [sic] allowed us to move forward with either working with employment counsel internally or outside counsel to create a more detailed and structured agreement that would have needed to be then further approved and signed. Q. Okay. All right. And then at that point - at what point would the proposal be, I guess, submitted to the employer, whoever it is that would need to look at the proposal? A. Yeah. So the process would be, for any type of bonus plan like this one, once the CEO had approved like this, we would work with counsel, either, you know, our internal employment counsel or outside counsel, to take the business context that you see in this email. Such as the specific milestones, technicalities about, you know, the timeline associated with them, how they're evaluated. Those would be iterated on and discussed. An agreement would be created, a formal document that would then be shared back with the employee for additional review and feedback. And ultimately, once everyone was aligned, that would be memorialized through, typically, a

Docusign where both the employee would sign either as an amendment to their employment agreement or some other, you know, enforceable agreement, and then a representative of the company would sign as well. Typically the CFO or the CEO."), 32:11-33:1; Ex. E, Sheri Bernal Depo. Tr., at 29:5-30:3.

> **RESPONSE:** Disputed. Defendant admitted in RFA No. 31 that "board-level approval was not required for individual milestone-based bonuses" and in RFA No. 33 that "there was no written policy requiring board approval for milestone-based bonus agreements." Pl. Ex. I, RFA Resp. (ECF No. 20-10), Nos. 31, 33. Plaintiff further disputes that McCree Lake's cited testimony reflects the process that existed in December 2022. McCree Lake conceded that before Q4 2022, Magic Leap's compensation approach was individualized and non-uniform. Pl. Ex. E, McCree Lake Dep. (ECF No. 20-6), at 220:4-11. The contemporaneous record further contradicts a uniform "policy": in the case of another retention plan recipient, John Monos, Stewart was already generating a DocuSign document before the plan had even been presented to the employee and before any shareholder approval had been obtained. Pl. Ex. L, Baltazar Dep. (Additional Excerpts), at 52:14-46:9. Stewart also directly contradicted McCree Lake's testimony that the process required involvement of internal employment counsel, testifying that she "never indicated it had to go through legal for any kind of approval." Def Ex. B, Stewart Dep. at 76:4-11.

7.      It is Magic Leap's policy, procedure, and practice to prepare detailed performance milestones before retention bonus plans could be sent for approval by the Board of Directors. Ex. C at 52:17-53:18; Ex. D at 49:5-17.

> **RESPONSE:** Disputed. Defendant's own sworn discovery responses contradict the Board approval premise entirely. Defendant admitted in RFA No. 31 that "board-level approval was not required for individual milestone-based bonuses." Pl. Ex. I, RFA Resp. No. 31. Defendant admitted in RFA No. 33 that "there was no written policy requiring board approval for milestone-based bonus agreements." Pl. Ex. I, RFA Resp. No. 33. Further, Larson-Green had in fact discussed and agreed upon milestones with Chu on December 1, 2022, including shipping improved hand tracking for Q1 2023. Pl. Ex. A, Chu Decl. (ECF No. 20-2), ¶ 6; ECF 1-5 at 1 (emails timestamped Thu, Dec 1, 2022 at 6:02 PM and 6:33 PM).

8.      It is Magic Leap's policy, procedure, and practice to memorialize with detail into a written agreement any proposals discussed with an employee, which is Docusigned by the employee and either the CEO or CFO. Ex. F, Jose Baltazar Depo. Tr., at 112:4-113:12; Ex. D at 21:6-22:20.

> **RESPONSE:** Disputed. Plaintiff was never informed that a DocuSign was required as a condition of his retention plan, nor was he provided with any employee handbook, written policy, or internal guideline stating that retention bonuses required a formal DocuSign to

become binding. Pl. Ex. A, Chu Decl., ¶¶ 10-11. The asserted "policy" was not followed in practice: in the case of another retention plan recipient, John Monos, Stewart generated a DocuSign document before the plan had even been presented to the employee, and Monos ultimately left the company without signing. Pl. Ex. L, Baltazar Dep. (Additional Excerpts), at 45:14-46:9, 50:1-6; 52:13-22. If DocuSign memorialization were truly a condition precedent to a binding commitment, there would have been no reason to generate one before the employee had even reviewed the terms. The December 16, 2022 email exchange itself constitutes a written agreement under Virginia law. *See Chittum v. Potter*, 216 Va. 463, 467 (1975); Va. Code § 59.1-485.

9.      Julie Larson-Green did not have authority to bind Magic Leap with regard to employee bonus compensation. Ex. D at 212:16-22; Ex. F at 110:14-16.

**RESPONSE:** Objection. Whether an employee has "authority to bind" a corporation is a legal conclusion, not a material fact, and therefore no response is required under Local Rule 7(h). To the extent a factual response is required, Disputed. The December 16, 2022 retention plan terms were communicated to Plaintiff by Victoria Stewart, Magic Leap's Head of Global Total Rewards, with Larson-Green designated to define the milestones. ECF 1-6 at 1. Stewart subsequently described the retention plan for Plaintiff as "agreed" in a January 21, 2023 email. Pl. SUMF (ECF No. 20-1), ¶ 22.

10.     Jose Baltazar did not have authority to bind Magic Leap with regard to employee bonus compensation. Ex. D at 176:21-177:8; Ex. F at 110:11-13.

**RESPONSE** Objection. "Authority to bind" is a legal conclusion, not a material fact. To the extent a factual response is required, Disputed. The cited testimony (Def. Ex. F at 110:11-13) only addresses whether Baltazar had unilateral authority. Baltazar was Magic Leap's CHRO and responsible for compensation approvals. Pl. Ex. L, Baltazar Dep. (Additional Excerpts), at 14:8-15:4, 19:14-18; 78:6-12. Larson-Green explicitly designated Baltazar to negotiate Plaintiff's retention compensation (Pl. Ex. A, Chu Decl., ¶ 5), he directly negotiated the terms (Def. Ex. I), and he directed Stewart to communicate the final plan.

11.     All proposed bonuses, including Chu's proposed bonus, were contingent upon approval from multiple individuals and ultimately the Board of Directors. Ex. F. at 113:6-12; Ex. B at 64:1-11 ("Q. But there was an entire department that, essentially, made the determination as to, yes, this would—we approve this bonus, we don't approve this bonus? A. For the run-of-the-mill cases, yes. Q. So when they're coming on board, this department has to make that determination, and then it gets memorialized in the group that you supervised offer letters, or whatever the written documents is? A. I think so. I think so.").

**RESPONSE:** Disputed. Defendant's own sworn discovery responses contradict the assertion that bonuses required approval from "the Board of Directors," admitting that "board-

level approval was not required for individual milestone-based bonuses" (Pl. Ex. I, RFA Resp. No. 31) and that "there was no written policy requiring board approval for milestone-based bonus agreements" (Pl. Ex. I, RFA Resp. No. 33). To the extent approvals from other bodies were required, that fact supports rather than undermines Plaintiff's position: when Magic Leap's Head of Global Total Rewards presented Chu with concrete retention terms on December 16, 2022, Chu reasonably understood that the necessary internal approvals had already been obtained. No one at Magic Leap informed Chu that the retention bonus was contingent on any outstanding approval by shareholders, noteholders, the PIF, or any other body. Pl. Ex. A, Chu Decl., ¶¶ 9-11. Bernal confirmed that the approval requirement was not "typically advertised" to employees. Pl. Ex. D, Bernal Dep. (ECF No. 20-5), at 34:19-20. Further, the Chu deposition testimony Defendant cites (Def. Ex. B at 64:1-11) addresses the approval process for initial hiring bonuses for incoming employees ("when they're coming on board"), not separately negotiated retention plans. Defendant's own witnesses confirmed that the annual performance bonus is "completely separate" and "distinct" from a retention plan. Pl. Ex. B, Stewart Dep. at 147:1-148:18; Pl. Ex. E, McCree Lake Dep. at 90:16-91:5; 94:11-13.

### c. Communications Regarding Chu's Proposed Bonus Framework

12.     On October 20, 2022, Jose Baltazar emailed Magic Leap CEO Peggy Johnson and Magic Leap CFO John Doherty: "Please see below what Julie and I agreed on for David Chu. Julie (cc'd) is deciding on when they in effect [sic] as it might be Q1 2023 but TBD for now. We will also tie specific milestones to it. @Peggy Johnson please provide your approval and we will proceed accordingly." Ex. G, October 20, 2022, Emails, at DEF_000122.

**RESPONSE:** Undisputed.

13.     On October 20, 2022, Johnson responded to the email from Baltazar with "Approved." Ex. G at DEF_000122-123.

**RESPONSE:** Undisputed.

**14.**     On December 2, 2022, Chu emailed Larson-Green regarding a potential framework for performance milestones: "Let me know what you think QN. Ship improved hand tracking QN+1. Q3. Ship AT Cloud Dense Map Merge for Digital Twins QN+2. Ship Omniverse Private Beta QN+3. Ship new cloud perception capabilities." Ex. H, ECF 1-5, at 1.

> **RESPONSE:** Disputed in two respects. First, the date is wrong. The face of the exhibit shows the email was sent on Thursday, December 1, 2022 at 6:02 PM, not December 2. ECF 1-5 at 1. Second, the characterization of the milestones as merely a "potential framework" is disputed. Chu proposed specific, concrete milestones tied to identifiable technical deliverables, and Larson-Green confirmed them thirty-one minutes later, responding "Looks good to me!" ECF 1-5 at 1 (email timestamped Thu, Dec 1, 2022 at 6:33 PM). These were agreed-upon milestones, not a preliminary discussion.

**15.**    Later on December 2, 2022, Larson-Green responded to Chu: "Looks good to me! Here's what Vicky sent me. Let me know what you think." Ex. H at 1. This email also contained a proposed framework for the compensatory portion of Chu's proposed retention bonus plan. Ex. H at 1.

> **RESPONSE:** Disputed as to the date and characterization. Larson-Green's response was sent on December 1, 2022 at 6:33 PM, the same day as Chu's email, not "later on December 2." ECF 1-5 at 1. Larson-Green's unqualified endorsement of the milestones ("Looks good to me!") confirms that the performance conditions were settled as of December 1, 2022, fifteen days before the December 16 compensation terms were communicated. The attached compensation table forwarded by Larson-Green was Stewart's initial compensation proposal, which Chu rejected the same evening ("pretty far from expectations"), leading to further negotiations and a revised offer on December 16. ECF 1-5 at 1. The characterization of this table as merely a "proposed framework" for Chu's "proposed retention bonus plan" is disputed; it was an initial offer in an ongoing negotiation that culminated in the December 16 agreement.

16.    Chu responded to Larson-Green's proposed compensatory framework, rejecting the framework: "Thanks for sharing. To be honest, it's pretty far from expectations…." Ex. H at 1-2.

> **RESPONSE:** Disputed as to characterization. The email Chu rejected was not a "proposed compensatory framework" but an initial compensation offer forwarded by Larson-Green from Stewart. Undisputed that Chu rejected that initial offer from Stewart but the parties continued to negotiate. Def. Ex. H, at 1-2; Def. SUMF ¶¶ 15, 17, 19.

17.    On December 8, 2022, Baltazar emailed Larson-Green and Victoria Stewart: "Hi Julie and Victoria, I am talking to David next week, are we aligned on the latest proposal from Vicky?" Ex. I, December 8, 2022 Emails, at DEF_000210.

> **RESPONSE:** Undisputed.

18.    Larson-Green was carbon copied on a December 8, 2022 email from Victoria Stewart to Jose Baltazar which stated Chu's bonus compensation "would be funded through the 2023-24 retention budget." Ex. I at DEF_000210-211.

> **RESPONSE:** Undisputed. This email confirms that Magic Leap had identified a specific funding source for Chu's retention plan before the December 16, 2022 offer was communicated.

19.    On December 16, 2022, Stewart emailed Chu regarding a revised proposed framework for the compensatory portion of his proposed retention bonus plan: "David, We are circling back with a retention plan that provides quarterly payments over the next two years (2023 - 2024). The plan is designed for more in Year 1 vs. Year 2 and will have key milestones, as

defined by Julie, associated with the payouts. Please take a moment to review the attached (password will be sent separately) and provide us with your feedback and/or any questions you might have." Ex. J, December 16, 2022 Emails, ECF 1-6 at 1.

> **RESPONSE:** Undisputed as to the content of Stewart's email. Disputed as to the characterization of the December 16 email as merely a "revised proposed framework." Stewart's email communicated concrete terms: quarterly payments over two years (2023-2024), with more in Year 1 than Year 2, tied to key milestones as defined by Larson-Green. The email did not state that the offer was "proposed," "contingent on further approval," "subject to Board approval," or "pending a DocuSign." McCree Lake confirmed the email contained no conditional or discretionary language. Pl. Ex. E, McCree Lake Dep. at 30:6-31:2, 30:14-20. Stewart's use of "circling back" confirms she was returning to Chu after prior discussions, not initiating a new preliminary concept. Stewart herself later described the arrangement as "agreed." Pl. SUMF, ¶ 22.

20.    Chu responded to Stewart's revised proposed framework on December 16, 2022: "Thank you for providing the details here, and for investing in me. Let's do it." At this point, no milestones had been specified by Larson-Green. Ex. J, ECF 1-6 at 1.

> **RESPONSE:** Disputed. First, Stewart's December 16 email was not a "revised proposed framework" for the reasons stated in response to ¶ 19. The email communicated concrete retention terms without any conditional language, and McCree Lake confirmed the email contained no language indicating the offer was "conditional" or "discretionary." Pl. Ex. E, McCree Lake Dep. at 30:6-31:2, 30:14-20. Second, it is disputed that "no milestones had been specified by Larson-Green." On December 1, 2022, not December 2 as Defendant states in ¶ 14, Chu proposed specific milestones to Larson-Green, including shipping improved hand tracking for Q1 2023, and Larson-Green responded "Looks good to me!" thirty-one minutes later. ECF 1-5 at 1 (emails timestamped Thu, Dec 1, 2022 at 6:02 PM and 6:33 PM; Pl. Ex. A, Chu Decl., ¶ 6. The milestones had been agreed upon between Chu and his direct supervisor fifteen days before the December 16 compensation terms were communicated. Magic Leap admitted in its interrogatory responses that "Plaintiff completed the Q1 performance milestone." Pl. Ex. H, Interrog. Resp. (ECF No. 20-9), No. 7.

21.    Larson-Green replied to Chu's email on December 16, 2022: "Happy to hear that! Looking forward to all we can accomplish together in 2023!" Ex. J, ECF 1-6 at 1.

> **RESPONSE:** Undisputed.

22.    On January 21, 2023, Stewart emails Green: "Julie, As a reminder, we had agreed to a $600k retention for David Chu (attached) to which you were going to assign specific milestones. My assumption is that it is being funded through the approved Retention Plan we are working on but will defer to Jose to weigh in to confirm if we have separate funding for this one.

I just want this to be brought back to the surface as I don't believe this has been initiated pending the defined milestones." Ex. K, January 21, 2023 Email, at DEF_000132.

> **RESPONSE:** Undisputed as to Stewart's email. However, Defendant omits Larson-Green's reply sent the same day, just twenty-three minutes later, in which Larson-Green stated: "We agreed on the milestones a while back." Def. Ex. K at DEF_000132; Pl. Ex. B, Stewart Dep. at 62:20-21 (Stewart acknowledging Larson-Green's statement).

23.     On April 11, 2023, Shirley Zajia emailed Sheri Bernal and Stewart: "Jose did present a retention plan for David in December that we worked with Julie on that landed at $600k (see below) but then it was placed on hold to be included/funded by the new Retention Pr. There has not been a retention agreement executed at this time for us to proceed with any payment given the Retention Program was placed on hold." Ex. L, April 2023 Emails, at DEF_000102.

> **RESPONSE:** Undisputed as to the existence of the email chain, though the quoted language is Stewart's inline response to Zajia, not Zajia's own words. Def. Ex. L at DEF_000102 (Zajia email at 5:22 PM; Stewart inline response at 7:04 PM). More significantly, this email chain is an internal discussion among Magic Leap employees about what to tell Chu, confirming that Chu was unaware of any hold on his retention plan. Zajia's actual email states: "Based on commitment approved by Jose B., he is due payment this month," and "Both Julie and I have no doubt that when he does not see payment, he will want answers." These are Magic Leap employees acknowledging that Chu expected payment because he understood the commitment to be binding, and that the holdup had never been communicated to him.

24.     April 25, 2023 email from Sheri Bernal to Larson-Green: "I will go back and look at what you shared in writing. I understood that this was not his sign on commitment (that was paid in full thankfully) but the same retention promise made to others with the understanding that 'we were working on retention for them.' In this case we gave him an option of what that would look like via email but no formal offer or signed documents as we had done in practice before or do today. The only reason I cannot offer him the bonus is because we do not have bonus dollars from the PIF. It was not approved by them and I was told flat out: no." Ex. L at DEF_000157.

> **RESPONSE:** Disputed to the extent Defendant offers this email as evidence that no agreement existed or that the bonus was discretionary. Bernal identifies a single reason for non-payment: "The only reason I cannot offer him the bonus is because we do not have bonus dollars from the PIF." She does not state that no agreement existed, that the bonus was discretionary, or that Chu failed to complete milestones. Bernal describes the arrangement as a "retention promise," not a "proposal" or "framework." Bernal also testified separately that she thought Magic Leap "should honor this." Pl. Ex. D, Bernal Dep. at 90:8-9.

25.      On April 25, 2023, Bernal emailed Stewart a summary of her call with Chu: "(1) David Chu - Spoke to him openly that we had approval on design, not on funding - Largest investor asked us to hold off until after JA - We are all not keen to do this but need to continue to watch market tells just like with bonus - can't honestly say we'll get the money then but we are also exploring other options with equity, etc - will share more as I have it, you and I will stay connected - let us know if gets to point needs to find another job so we can try to do something - he wants a 4-way meeting with you, me, Julie next week to get everyone on the same page May go south after he speaks with family tonight but he thanked me for honesty / transparency and seemed very rational. We even laughed during parts of conversation." Ex. L at DEF_000126.

> **RESPONSE:** Disputed to the extent Defendant offers this email as evidence that no agreement existed. Bernal's summary of her call with Chu confirms that the holdup was communicated to Chu for the first time in April 2023, months after the December 2022 agreement was formed. Bernal told Chu they had "approval on design, not on funding" and that the "largest investor asked us to hold off." She did not tell Chu that no agreement existed or that the bonus was discretionary. Her statement "we are all not keen to do this" reflects Magic Leap's internal discomfort with reneging on a commitment it recognized existed.

26.      Baltazar told Chu that his retention bonus plan had to be approved by the Board of Directors. Ex. F, Baltazar Depo. Tr., at 109:10-110:10 ("Q. Mr. Baltazar, did you ever tell Mr. Chu that his compensation plan had to be approved by the shareholders? A. From what I recall, I believe so. Q. And was that a phone call conversation or an email? A. I think it was a verbal conversation when we had the discussion on the exhibit that was shown earlier on the December one. Q. And independent of any conversation that you had with Mr. Chu, should he have known that all compensation plans had to be approved by the shareholders? A. Yes. Q. Why should he have known that? A. Everyone in the leadership knew that everything had to be approved by the shareholders regarding compensation. Q. And as - I believe Mr. Chu was a vice president of the engineering or some engineering division, he was considered leadership that should have known about this? A. That's correct.").

> **RESPONSE:** Disputed. Defendant mischaracterizes its own citation, as Baltazar's quoted testimony refers exclusively to shareholder approval, not the Board of Directors. Furthermore, Chu explicitly denies this conversation ever occurred, submitting a sworn declaration stating that Baltazar never informed him, verbally or in writing, that his retention plan required shareholder, noteholder, or PIF approval. Pl. Ex. A, Chu Decl., ¶¶ 10-11. Baltazar's own memory of this alleged conversation is entirely speculative; he hedges with phrases like "I believe so" and "I think it was," (Def. Ex. F, Baltazar Depo. Tr. at 109:13, 109:16), and later explicitly admits under oath that he does not actually remember when this call supposedly happened. Def. Ex. F, Baltazar Dep. Tr. at 114:1-3 ("Q. Do you remember when this call happened? A. I don't remember."). Finally, this assertion directly contradicts Magic Leap's own formal admission in RFA No. 31 that

board-level approval was not required for individual milestone-based bonuses. Pl. Ex. I, RFA Resp. No. 31.

### d. Chu's Proposed Retention Bonus Plan

27.    Chu's proposed retention bonus plan was never approved by Magic Leap or the Board of Directors or memorialized into a written, signed agreement. Ex. M, March 2023 Emails, at DEF_000121 ("he needs to understand that his retention is part of the broader Retention Plan that is still pending final sign off. We hope to have a better answer for you after tomorrow's meeting with the BoD/Comp Committee but we haven't received the okay to proceed forward with generating the employee agreements/notifications as of yet. Once approved, he will receive the full amount of what we discussed with him but the timing might be off slightly. Will keep you posted."), Ex. D at 178:12-179:3 ("[T]here was alignment and discussion about proposed retention and milestone bonus payment, but there was never any formalization of that agreement in a way that it was documented, accrued, entered into any finance or payroll system, entered into any HRAS system. So our knowledge of this and our contention is that while there was alignment clearly from all of the discussion, there was never any formalization, and everyone on the thread and Mr. Chu would have known that had to be formalized in order to be paid.").

> **RESPONSE:** Disputed. Defendant's own sworn discovery responses contradict the "Board of Directors" approval premise, admitting that "board-level approval was not required for individual milestone-based bonuses" (Pl. Ex. I, RFA Resp. No. 31) and that "there was no written policy requiring board approval for milestone-based bonus agreements" (Pl. Ex. I, RFA Resp. No. 33). Defendant's discovery responses consistently identify a different barrier: "approval of the noteholders under Amendment No. 7 to the Note Purchase Agreement." Pl. Ex. I, RFA Resp. Nos. 15, 31, 33. Yet Amendment No. 7 was not executed until February 1, 2023, nearly seven weeks after the December 16, 2022 agreement. Pl. SUMF, ¶¶ 49-50. To the extent internal approvals were required, when Magic Leap's Head of Global Total Rewards presented Chu with concrete retention terms on December 16, 2022, Chu reasonably understood that the necessary approvals had already been obtained. No one informed him otherwise. Pl. Ex. A, Chu Decl., ¶¶ 9-11. The December 16, 2022 email exchange constitutes a written agreement under Virginia law. *See Chittum v. Potter*, 216 Va. 463, 467 (1975); Va. Code § 59.1-485. Defendant's own cited evidence confirms rather than undermines this understanding. Stewart's March 2023 email states that "[o]nce approved, he will receive the full amount of what we discussed with him" (Def. Ex. M at DEF_000121), acknowledging a specific agreed-upon amount and treating payment as a question of timing, not existence. McCree Lake conceded "there was alignment clearly from all of the discussion" (Def. Ex. D, at 178:17-19), disputing only internal formalization steps that were never communicated to Chu.

28. Magic Leap and Chu did not set forth any proposal as to steps to attain quarterly milestones. Ex. B at 148:8-152:5; Ex. D at 49:8-17 ("[B]ased on my reading, the—the general

framework of the milestones would have been agreed upon, but consistent with our practices, and all of these leaders would have known that additional details are needed. And that's visible from the perspective that Julie's even saying she doesn't have a way to track them, and that Vicky is noting that we haven't initiated additional activities to formalize it.").

> **RESPONSE:** Disputed. On December 1, 2022, Chu proposed specific milestones to Larson-Green, including shipping improved hand tracking for Q1 2023, and Larson-Green confirmed them the same day. (ECF 1-5 at 1; Pl. Ex. A, Chu Decl., ¶ 6.) The December 16, 2022 email expressly designated Larson-Green as the person who would define the milestones. (ECF 1-6 at 1.) Both Stewart and McCree Lake confirmed under oath that Larson-Green had the authority to set the milestones and determine whether they were met. Pl. Ex. B, Stewart Dep. at 125:4-6; Pl. Ex. E, McCree Lake Dep. at 55:4-14. McCree Lake further confirmed that Larson-Green agreed Chu completed the milestone. Pl. Ex. M, McCree Lake Dep. (Additional Excerpts), at 59:11-62:20. Further, Defendant admitted in its Answers to Interrogatory No. 7 that Chu completed the Q1 performance milestone. Pl. Ex. H, Interrog. Resp No. 7. Defendant cannot simultaneously designate Larson-Green as the person who defines and assesses the milestones, admit she approved them, admit Chu completed them, and then argue milestones were never set forth.

29. Chu never signed any agreement memorializing his final retention bonus plan. Ex. B at 111:19-112:20.

> **RESPONSE:** Disputed as to the legal implication. Chu accepted the retention plan in writing via email on December 16, 2022, stating "Let's do it." (ECF 1-6 at 1.) Under Virginia's Uniform Electronic Transactions Act, Va. Code § 59.1-485, an electronic record satisfies any law requiring a writing. A DocuSign is one form of written agreement; it is not the exclusive form recognized under Virginia law. *See Chittum v. Potter*, 216 Va. 463, 467 (1975) (letters exchanged between parties formed a binding contract). That Chu did not sign a separate DocuSign document reflects Magic Leap's failure to generate one, not the absence of mutual assent.

30.    Chu's proposed bonus retention plan was never finalized in order to be sent to the Board of Directors for approval. Ex. C at 51:1-16 ("A. Well, based on this email stream, this was something that was being proposed. It was the framework of what a retention plan might look like. And we were seeking feedback in order to be able to go to the next steps with finalizing the plan. Q. All right. Does it mention anything about going to the next steps or any next steps referring to that in this email chain? A. 'Please take a moment to review the attached and provide us with your feedback and/or any questions you might have.' So this wasn't - at this point in this email stream, it was something that was being presented for consideration but it wasn't anything that was final."), 52:17-53:3 ("A. But I do know that we were specifically looking for milestones to be detailed out before anything could be taken to the next step. Q. Understood. All right. A. Just because David is okay with the framework and Julie is like, I'm glad to hear that, that doesn't mean it's done until

we finalize all the details of the retention plan and get final approval to document the Docusign."); Ex. F at 111:20-3.

> **RESPONSE:** Disputed. Defendant again invokes "Board of Directors" approval, a requirement its own sworn discovery responses disclaim. As set forth in Plaintiff's response to ¶ 27, Defendant admitted in RFA Nos. 31 and 33 that board-level approval was not required for milestone-based bonuses and that no written policy required such approval. Defendant's own discovery responses consistently identify the barrier as noteholder approval under Amendment No. 7, which was not executed until February 1, 2023, nearly seven weeks after the December 16, 2022 agreement. Pl. SUMF, ¶¶ 49-50. Stewart's cited testimony that "it wasn't anything that was final" reflects her post-hoc characterization under examination by Defendant's counsel, contradicted by her own contemporaneous use of the word "agreed" five weeks later. Pl. SUMF, ¶ 22. The fact that Magic Leap's internal administrative process was not completed does not defeat contract formation where Magic Leap never communicated those internal requirements to Chu as conditions of the offer. Pl. Ex. A, Chu Decl., ¶¶ 10-11; Pl. Ex. D, Bernal Dep. at 34:19-20.

31. As described above, it was Magic Leap's policy and practice for retention bonuses that there be a signed amendment to an employee's offer following approval by the Board of Directors. Ex. F at 112:4-113:12; Ex. D at 21:6-22:20; Ex. B at 64:1-11. That did not occur in Chu's case.

> **RESPONSE:** Disputed. As set forth in Plaintiff's response to ¶¶ 27 and 30, Defendant's own sworn discovery responses admit that board-level approval was not required for milestone-based bonuses. Pl. Ex. I, RFA Resp. Nos. 31, 33. The cited Chu deposition testimony (Def. Ex. B at 64:1-11) addresses onboarding bonuses for new hires, not retention plans for existing employees, and Chu's answers are equivocal. Chu himself distinguished the two instruments at his deposition, testifying that the annual bonus was not involved in his negotiations and that the retention bonus was a separate, more guaranteed form of compensation. Def. Ex. B at 110:15-22. Chu further testified that the email exchange constituted the agreement and that a wet signature or DocuSign was not necessary. Def. Ex. B at 111:22-112:13. That Magic Leap failed to complete its own internal administrative steps does not negate a binding agreement where those steps were never communicated to Chu as conditions precedent.