Exhibit L

Deposition of Jose Baltazar (Additional Excerpts), February 11, 2026

A.   It was when the new CEO came and Peggy came onboard.  The company was going through a transition.  And I was asked if I would help the company turn around because we were losing -- we were losing a lot of employees.  And she asked me if I wanted to take on that challenge.

Q.   Okay.  And did you immediately -- were you immediately transitioned to human resources?

A.   My title was chief transformation and people officer.

Q.   Is that separate from the CHR role?

A.   It's part -- HR is part of those functions.

Q.   But you mentioned Carlos was the chief human resources officer prior, I guess right around the time you started as an employee?

A.   He was fired.

Q.   Okay.

A.   They started doing the layoff.  When COVID hit we had to downsize the company.

Q.   So did you take over his responsibilities?

09:26:56
09:27:03
09:27:07
09:27:15
09:27:20
09:27:23
09:27:26
09:27:29
09:27:36
09:27:39
09:27:40
09:27:44
09:27:46
09:27:47
09:27:51
09:27:54
09:27:56
09:27:59
09:27:59
09:28:01
09:28:04
09:28:06

Q.   Yes.  In terms of transitioning, in terms of explaining to you what your responsibilities were.  I'll start with that.   09:33:00 09:33:02 09:33:04

A.   Again, sorry, I just want to be super specific.  So the transition, there was an existing team in place, you know, a couple folks on the team and they are the ones that transitioned the work to me.   09:33:09 09:33:11 09:33:13 09:33:16 09:33:24

Q.   So the team that you began leading, the people reporting to you sort of brought you up to speed on the job?  Would that be accurate?   09:33:26 09:33:27 09:33:31

A.   Again, they brought me up to speed on the situation of the company.   09:33:33 09:33:36

Q.   Okay.  So let me ask you this, be more specific, when you -- was employee compensation one of your responsibilities as the chief transformation and people's officer?   09:33:38 09:33:42 09:33:46 09:33:49

A.   That's correct.   09:33:51

Q.   Okay.  How did you learn about the process of, I guess, approving or disapproving or any of that whole process?   09:33:52 09:33:53 09:33:58

A.   So we build a team.  I hired a person   09:34:01

A.   Yes.  That's the document that gets prepared to SuccessFactor.  But they only sign after the shareholders have approved.

MS. BONAFEDE:  Jeremy, can we take a break now?

MR. HUANG:  Absolutely.  Yes, we can take a break.

THE VIDEOGRAPHER:  Stand by.  We are going off the record at 10:11 a.m.

(Pause in proceedings)

THE VIDEOGRAPHER:  We are back on the record at 10:22 a.m.

BY MR. HUANG:

Q.   All right.  Mr. Baltazar, I want to go back to Exhibit 3.  That's what we were discussing before the break.  All right.  So looking back at Victoria's November 30th email at 1:52 p.m., her statement was that she had approval from the CFO and the CEO to proceed at a certain step within the process; is that correct?

A.   That's correct.

Q.   Okay.  And so was there another step

10:11:17
10:11:21
10:11:24
10:11:26
10:11:28
10:11:29
10:11:29
10:11:31
10:11:33
10:19:46
10:22:11
10:22:12
10:22:16
10:22:16
10:22:19
10:22:21
10:22:40
10:22:45
10:22:48
10:22:54
10:22:57
10:22:58

between this and getting -- were there any -- walk me through the steps of what needed to be done after this in order to get the compensation change finalized?

A.    This is -- just to clarify on this process.  Are you asking for John Monos' process or are you asking for the general process, just to kind of align?

Q.    Are they different?

A.    John left at the end, so this was to try to keep him at the company.  Like, for example, this is a case where he didn't agree with the proposal and he left.

Q.    Okay.

A.    So what would typically happen is what I was mentioning.  After you get this approval, you put it in front of the employee.  Get his reactions.  That's what I'm saying, yes, you know, she is asking if she can enter into SuccessFactors and getting communications for James T.

"Yes.  Can you please confirm with James when he will have the conversation?"

When we get a signal that it's more or less aligned with the employee, then I will go and talk to the shareholders.  Shareholders align, then everything gets sent for signature for the employee.

Q.   Okay.  I want to move down to the next page.  So I want to look at the last email on the page from Victoria to you.  All right.

So you see the email, November 30th, 3:54 p.m.  That's about two hours after the email we just discussed?

A.   Yes.

Q.   Okay.  And it says, "James has what he needs for now to discuss with Monos.  I am working with Da'Nae on getting the information in SF and subsequently a document for Monos to sign."

Do you see that?

A.   Yes.

Q.   So it sounds like she was already preparing the approval document without even getting feedback from the employee.  Would that be accurate?

10:24:07
10:24:10
10:24:12
10:24:16
10:24:20
10:24:21
10:24:24
10:24:28
10:24:36
10:24:38
10:24:42
10:24:44
10:24:44
10:24:47
10:24:50
10:24:56
10:24:58
10:24:59
10:25:01
10:25:03
10:25:06
10:25:09

Transcript of Jose Baltazar
Conducted on February 11, 2026                    46

A.    But it still has to be routed.  James has to have the conversation like on the previous email that you just saw.

Q.    I understand.  But she was already generating a document for the employee signature; correct, at this juncture?

A.    Yes.  We prepare everything ready.  But as I mentioned on this scenario, the employee left.

Q.    So as you may or may not know, I spoke to Victoria a couple weeks back.  Her testimony was that the shareholders had to approve everything before a document was signed.  Is that inaccurate?

A.    That's what I said.  Right?  Isn't that what I mentioned that --

Q.    No.  I'll let you finish.  I am sorry.

A.    No.  Go ahead.

Q.    Okay.  So Victoria Stewart's testimony was that there needed final shareholder approval before a Docusign would be produced for the employee to sign.

Transcript of Jose Baltazar
Conducted on February 11, 2026                47

What do you say is the sequence of events?

A.    I think it's consistent with what I described.

Q.    Okay.  So in this document the email from two hours before said that she got approval from the CFO and the CEO; correct?

A.    That's correct.

Q.    There is no mention of the shareholders; correct?

A.    That's correct.

Q.    And as you testified, Mr. Monos had not agreed to the terms being presented at this point; correct?

A.    No.  If you read what it's saying here, it says, "I have approval for John Monos' retention.  Am I go to proceed in entering sales force -- SuccessFactors and getting a communication for James to share with Monos?"

Okay?  And I said, "Yes.  You can please confirm with James when he will have the conversation."

So what would happen is the document would get prepared.  Get the feedback from James.  Okay?  When we get the feedback -- we get the feedback from James and everything is ready.  I would get the shareholder approval.  I usually have to talk to them on the phone and get their confirmation.  If they confirm, then we route everything -- then send everything to sign.

Q.   Okay.

A.   But it cannot be signed until the shareholder tells me, yes, you can proceed.

Q.   Understood.  But I'm saying that Ms. Stewart's testimony is that the document is not even generated until there's shareholder approval -- final shareholder approval.  Is that inaccurate?

A.   I was not on your conversation with Vicky.

Q.   I understand.  But I'm telling you what -- based on what I've said -- based on what I've repeated to you, would that statement be inaccurate?

A.   That the document would be generated?      10:27:45

Q.   After shareholder approval.      10:27:47

A.   We will prepare everything in parallel,      10:27:50
but it's not going to be signed until we get the      10:27:53
approval.      10:27:55

Q.   That wasn't my question.  I'm going to      10:27:56
ask again.      10:27:57

Ms. Stewart's testimony was that the      10:27:59
Docusign -- the document that needs to be signed      10:28:01
is not generated until there is final approval      10:28:03
after all the back and forth for the employee and      10:28:05
the shareholders.      10:28:08

Is that an accurate statement?      10:28:08

A.   What do you mean by --      10:28:11

MS. BONAFEDE:  Objection.  Asked and      10:28:11
answered.      10:28:13

MR. HUANG:  I don't think he did.      10:28:13

THE WITNESS:  Can you clarify what do      10:28:15
you mean by "generated"?      10:28:17

BY MR. HUANG:      10:28:18

Q.   Okay.  So you look at the last email.      10:28:18
It says, from Victoria, she is subsequent --      10:28:20

"getting the document in SuccessFactors and subsequently a document for Monos to sign."

So you see that she is in the process of generating the document that the employee needs to sign; correct?

A.   Correct.  Yes.

Q.   Okay.  And you admit at this time that Mr. Monos either had not been presented with a plan and you admit that he eventually left the company, so either way the terms were not agreed to; correct?

MS. BONAFEDE:  Objection.  Form, compound.

BY MR. HUANG:

Q.   Okay.  Let me break this down for you.

Your testimony is that at this point the proposal had not been presented to Mr. Monos; correct?

A.   So again, let's follow the process. What is written --

Q.   I'm not asking about -- I don't think he's answered my question.

10:28:25
10:28:28
10:28:31
10:28:32
10:28:35
10:28:38
10:28:39
10:28:42
10:28:45
10:28:49
10:28:51
10:28:55
10:28:58
10:28:59
10:28:59
10:29:01
10:29:03
10:29:07
10:29:08
10:29:10
10:29:13
10:29:14

I'm asking a simple question.                    10:29:15

Mr. Monos had not -- your testimony was that      10:29:16

Mr. Monos had not been presented with the plan as  10:29:19

of the time of this email.  Is that correct, yes   10:29:21

or no?                                             10:29:24

A.   I need the other part of the email of      10:29:25

this question that I asked, when is James and      10:29:27

Monos meeting?  Do you have that part?             10:29:31

Q.   Let's look at -- the email literally       10:29:35

says, "James has what he needs now to discuss with 10:29:36

Monos."  Correct?  That's what the email says --   10:29:39

the last email?                                    10:29:41

A.   But what I'm asking you here if you have    10:29:44

the communication where --                         10:29:47

Q.   I'm not looking at that email.  Please      10:29:48

move down to the next page, defense Bates stamped  10:29:50

90.  That email.  Thank you.                       10:29:54

A.   Okay.                                        10:29:56

Q.   Could you read that email and tell me       10:29:57

what you understand this means?                     10:29:58

A.   "James has what he needs for now to          10:30:00

discuss with Monos.  I'm working with Da'Nae on    10:30:02

getting information in sales force --

SuccessFactors, subsequently a document for Monos

to sign."

Q.    Okay.  So based on this email, your

understanding, does it make sense that -- does it

appear to you that the manager had had the

conversation with the employee about the terms of

the proposal?

A.    He's going to have the conversation with

him.

Q.    Okay.

A.    That's what's written here.

Q.    So logically, Mr. Monos is not aware of

the proposal at this juncture?

A.    He has not reviewed.  That's what is

written here.  Right.

Q.    All right.  So --

A.    But -- go ahead.  No, no.  Go ahead.

Q.    So your testimony also was that

ultimately, Mr. Monos did not accept the proposal

and left the company; is that correct?

A.    Yes, that's correct.

you to weigh in on whether there's separate

funding for this particular retention.  Do you see

that?

    A.   Yes.  Like I mentioned, like I was

already gone.

    Q.   I understand.  So based on the process,

when you worked on these retention documents, what

were Vicki's responsibilities in relation to

yours, in terms of getting these retention plans

approved?

    A.   The approval would have to be on the

CHRO to go get the approval.

    Q.   Okay.  And what would be the next --

what would Vicki's -- how would she assist you in

doing these?

    A.   Can you clarify what you mean by

"assist"?

    Q.   Okay.  So in this scenario, my

understanding is that it appears from this email

that Ms. Stewart was under the understanding that

the retention for Mr. Chu had been approved.

Would that be a fair reading of this email?

11:04:26
11:04:29
11:04:32
11:04:32
11:04:34
11:04:35
11:04:40
11:04:43
11:04:47
11:04:51
11:04:51
11:04:53
11:04:56
11:04:57
11:05:00
11:05:03
11:05:05
11:05:06
11:05:08
11:05:12
11:05:16
11:05:19

exhibits, it gets put into SuccessFactors.  So there would be a template or something like that that legal has.  And, you know, Vicky would kind of fill it in and then upload everything to get it official.

Q.   And that final document that's Docusigned by the employee and leadership, whether you said that's the CFO or CEO, is that -- that is presented to the employee only after their shareholder approval; correct?

A.   Yes.  All the final signatures will only be done after the shareholder approval.

MS. BONAFEDE:  Okay.  Great.  I have no further questions.  Thank you, Mr. Baltazar.

THE WITNESS:  Okay.  Thank you so much.

MS. BONAFEDE:  You're on mute, Mr. Huang.

FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. HUANG:

Q.   Sorry about that.  Yes, so it actually prompted a few more questions.  Three questions and we're out.  All right.

So you claim you spoke to Mr. Chu by phone.  Do you remember when this call happened?

A.   I don't remember.

Q.   You don't remember.  Was this before or after December 16th?

A.   Way -- I mean, you mean when he told me -- which call are you referring to?

Q.   You just told us that you spoke to Mr. Chu and told him there was additional approvals required, a few moments ago; correct?

A.   Oh, you are referring to that.  I thought you were asking me when he told me that he didn't get paid.  That was after I left.

Yes.  That was -- I think that's what I was saying when I spoke to him.  I didn't say it was a phone call.  I said when I spoke to him being a phone call or it could have been in person.  I don't remember.  It was the same question I think you had asked me before.  It was whenever that email on the 16th, probably around that week when he discussed the new proposal and we are debating -- you know, when we're

11:58:35
11:58:38
11:58:40
11:58:41
11:58:45
11:58:46
11:58:48
11:58:50
11:58:52
11:58:56
11:58:59
11:59:00
11:59:02
11:59:06
11:59:08
11:59:10
11:59:12
11:59:14
11:59:16
11:59:18
11:59:21
11:59:25